[No. S011552. May 6, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
CLARENCE RAY, JR., Defendant and Appellant.

**COUNSEL**

Charles Bush, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Michael J. Weinberger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—In 1986, while serving a sentence of life imprisonment for first degree murder in Michigan, defendant Clarence Ray, Jr., approached the authorities and confessed to having committed certain crimes in Bakersfield, California two years earlier. Defendant was subsequently charged, tried, and convicted in Kern County for the crimes to which he had confessed.

Specifically, the jury found defendant guilty of the first degree murder of Kathy Lynn Hyde (Pen. Code, § 189),[1] the attempted premeditated murder of Mark Emmett Doss (§§ 189, 664), and the attempted robbery of both Hyde and Doss (§§ 211, 664). The jury determined that defendant personally used a firearm (shotgun) in committing each offense (§ 12022.5), and that he intentionally inflicted great bodily injury in attempting to rob and murder Doss (§ 12022.7). As to the murder of Hyde, three special circumstance allegations were found true under the 1978 death penalty law, namely, that the murder occurred during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(i)), and that defendant was twice previously convicted of murder in Michigan (§ 190.2, subd. (a)(2)). The jury further determined that, as to all counts, defendant had suffered three prior serious felony convictions in Michigan (two of which also served as the basis of the prior-murder-conviction special circumstances): a 1974 second degree murder conviction, a 1984 first degree murder conviction, and a 1984 armed robbery conviction. (§§ 667, subd. (a), 1192.7, subd. (c).) Finally, defendant pled guilty before trial to two counts of armed robbery arising out of separate incidents which occurred in California around the time of the capital crimes but which were unrelated thereto. Defendant admitted personal firearm use in one of the latter robberies.

The jury ultimately returned a death verdict. The trial court declined to modify the verdict (§ 190.4, subd. (e)), sentenced defendant to death for the murder with special circumstances, and imposed an additional 17-year prison term for the noncapital crimes. The record further reflects that after trial, defendant was transported from California to Michigan at his request and pursuant to a detainer agreement between the two states (see § 1389), subject to his return for execution of sentence in this state. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

No prejudicial error occurred at any phase of trial. We will therefore affirm the judgment in its entirety.

---

[1] All further statutory references are to the Penal Code except as otherwise stated.

## I. FACTS

Before trial, the court granted defendant's request to bifurcate the prior serious felony allegations and the prior-murder-conviction special-circumstance allegations from each other and from other phases of the trial. Hence, the trial proceeded in four distinct phases before the same jury as follows: the guilt phase, involving the murder and robbery counts and the robbery-murder special-circumstance allegation; the enhancement phase, involving allegations that defendant had suffered three prior serious felony convictions; the prior-murder-conviction special-circumstance phase; and the penalty phase.

### A. *Guilt Phase*

The crimes occurred around 11:30 p.m. on April 17, 1984, at Tex's Barrel House, a country western bar and dance hall located in Bakersfield. The surviving victim, Mark Doss, testified that he happened to meet an acquaintance, Kathy Hyde, after arriving at the bar that night. In an apparent attempt to avoid the noise and crowd inside, they walked out to the parking lot and discussed a threatening letter Hyde had received from her boyfriend, whom Doss also knew.

A short time later, two armed strangers approached. One of the men, later identified as defendant, carried a shotgun. His partner, James Schultz, was armed with a pistol. Doss testified that the parking lot was well lit and that he had no difficulty seeing the faces of both men. Doss also noticed that each gunman wore "fatigues."

Schultz apparently pointed the pistol at the victims and ordered that they retreat to a darker, less visible area of the parking lot. When they hesitated, defendant pumped the shotgun, aimed it at Doss, and said, "Get to the back of the lot, you redneck son of a bitch." Schultz then began pushing Doss with the pistol. Doss grabbed the gun and started wrestling with Schultz. Schultz yelled, "shoot him, shoot him." Defendant approached and, from a distance of about two feet away, fired the shotgun and struck Doss in the abdomen.

Hyde then attempted to run away. Doss heard one of the assailants yell, "get her." Doss lost sight of Hyde, but heard two more shots being fired. At this point, defendant and Schultz fled the scene.

Doss stumbled into the bar and collapsed on the floor. Police and paramedics soon arrived. Doss was transported to the hospital and underwent surgery. He sustained permanent, disabling injury as a result of the shooting.

Meanwhile, Hyde had received a shotgun wound to the chest. Bar patrons and employees discovered her slumped against a vehicle in the parking lot, barely alive. She died in the hospital two days later. The medical examiner who performed the autopsy testified that Hyde had likely been shot from a distance of six to nine feet.

During the investigation, Bakersfield police uncovered three shotgun shells at the scene and eliminated Hyde's boyfriend as a possible suspect in the crimes. Doss also assisted the police in preparing a composite drawing in order to help identify the man who had fired the shotgun. However, the lead detective in the case, Leslie Vincent, testified that these efforts produced no arrests or additional suspects and that the investigation essentially reached a dead end.

In March 1986, almost two years after the crimes, defendant approached an employee in the Marquette, Michigan prison where he was incarcerated and expressed a desire to talk about his past. Donald Leffel, who worked as a correctional investigator at Marquette, was informed of this request and arranged to meet with defendant the same day.[2]

The circumstances surrounding defendant's un-*Mirandized*[3] meeting with Leffel were elicited primarily at a pretrial suppression hearing and will be discussed later in the text. At trial, Leffel testified that defendant volunteered his involvement in several crimes which he and his friend Schultz committed in California in April 1984 and which defendant believed would otherwise remain unsolved. Defendant told Leffel that Schultz had since died, and that he (defendant) had been reading the Bible and wished to atone for his mistakes. He also expressed concern that an innocent person might be accused of the crimes.

Defendant's statement to Leffel was tape-recorded and played for the jury.[4] Defendant had difficulty remembering the names of streets and other landmarks, but he otherwise recounted the following events: defendant and Schultz traveled by bus from Michigan to Bakersfield, rented a motel room near the bus station, and immediately began planning a "stick up." Armed

---

[2] The guilt jury learned that defendant was in prison when he admitted the crimes against Hyde and Doss, and that he pled guilty to two unrelated counts of armed robbery before trial. However, the jury learned only after the guilt verdict had been rendered and during subsequent phases of trial that defendant was serving a life sentence for first degree murder at the time he confessed.

[3] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (*Miranda*).

[4] As agreed by the court and counsel, the jury heard an edited version of defendant's confession. This version omitted references to defendant's criminal conduct and background that were unrelated to the crimes charged in the present case.

with a BB gun and a plastic pistol, they stole several hundred dollars from an "old man" who operated a liquor store nearby (one of the crimes to which defendant pled guilty before trial). The pair then traveled to Santa Barbara, where defendant bought a 12-gauge shotgun and sawed off the barrel. Low on cash, defendant and Schultz departed for Bakersfield.

According to defendant, the pair returned to the area near the bus station and the liquor store they had previously robbed, but stayed in a different motel. They located the Barrel House some distance away and decided to "rob everybody" inside. Defendant directed Schultz to enter the bar and see "how it's lay[in']" while defendant waited outside. Apparently dissatisfied with Schultz's report, defendant went inside and pretended to use the telephone. Because 40 to 50 people were there, including truck drivers who might be armed and "dangerous," defendant and Schultz decided to first steal a getaway car from the parking lot. Hyde and Doss were confronted for this reason—to "tie them up" and "take their car." Although the details were not fully explained to Leffel, defendant and Schultz apparently intended to drive back to the motel or bus station after the robbery, abandon the car, and leave Bakersfield by means of a bus route they had "figured out" in advance.

Defendant acknowledged, however, that the "plan" went awry. He described the confrontation with Hyde and Doss in a manner substantially the same as Doss's testimony at trial. Defendant also admitted that he shot both victims,[5] and that he and Schultz immediately fled the scene and apparently returned to the motel. Although their room was paid for the night, the pair was "scared," "broke," and desperate to "get out" of town. As a result, they robbed another liquor store the next day (the second crime to which defendant pled guilty before trial). They promptly left Bakersfield on a bus bound for Detroit.

In March 1986, shortly after defendant made the foregoing statements to Leffel, the information was relayed to Detective Vincent in Bakersfield. Based on a photographic display prepared by Vincent with the assistance of Michigan police, Doss identified defendant as the man who fired the shotgun and recognized Schultz as the man holding the pistol. Doss also later identified defendant at a physical lineup and during trial.

In July 1986, four months after the Leffel confession, Detective Vincent traveled to Marquette, advised defendant of his *Miranda* rights, and questioned him about the crimes. A tape recording of this interview was played

---

[5]Defendant told Leffel that after Doss grabbed Schultz's gun, "Schultz got away from him and I shot him, okay, with a .12 gauge birdshot, buckshot . . . . [H]e goes down. I—I hit him right in the gut. [¶] . . . And the woman [Hyde], she starts running about 15 feet or something like that. Anyway, me and *Schultz is* . . . running and I see a woman up there hurt, you know. I knocked her down [with a shotgun blast]. So we take off . . . ."

for the jury.[6] As in the Leffel statement, defendant described the various crimes he committed with Schultz in Bakersfield in April 1984. Thus, Vincent learned that the pair planned to steal a car and rob the Barrel House, and that defendant was the person who fired the shotgun. During the Vincent interview, however, defendant gave a more detailed account of his mental state at the time of the crimes, including his intent to shoot both victims and his assumption that Hyde was more likely to survive than Doss.[7] Finally, defendant drew several sketches of the crime scene for Detective Vincent, and acknowledged that the composite drawing prepared by Doss shortly after the crimes was accurate.

At the close of the prosecution's case, the defense rested without introducing any evidence on the issue of guilt.

## B. *Enhancement Phase*

The prosecution presented certified copies of documents indicating that, before trial in the present case, defendant had sustained three serious felony convictions in Michigan, as follows: a second degree murder conviction entered upon a guilty plea on December 11, 1974, an armed robbery conviction entered following a jury trial on November 14, 1984, and a first degree murder conviction entered following a jury trial on December 6, 1984. In addition, Investigator Leffel testified that defendant was serving a life sentence in Marquette for the 1984 Michigan murder at the time he confessed to the present crimes. Leffel also testified that defendant had previously served a 10-year term in the same prison following his conviction for murder in 1974.

Defendant presented no evidence at this phase of trial.

---

[6]As with the Leffel confession, the version of the Vincent interview heard by the jury was edited to delete irrelevant information concerning defendant's criminal history. The edited version also did not include a preliminary portion of the interview that occurred before Detective Vincent advised defendant of his *Miranda* rights. As suggested, defendant's pretrial motion to suppress both confessions will be discussed later in the text.

[7]Defendant told Vincent in part, "The guy [Doss] grabbed Schultz's gun. Schultz got away from [him] and I shot him in the gut . . . . [¶] The woman [Hyde], she took off. She was running. So while we was running in this direction, I shot at her, too. [¶] I guess, from what I understand, she's the one that died. . . . [¶] The guy lived, but she died. *But I shot the guy pointblank range with a 12-gauge shotgun* and he lived. I was 25 feet on the run, at dark time, just shooting in her direction and I hit her. She dies. I don't understand that. Seem like he should of died but she didn't have [to die]. . . . [¶] *I thought I shot him dead in the stomach.* . . . [¶] I [started] running away [in the direction of] our escape route [rather than in the direction of Hyde]. . . . [¶] [S]he was just ready to go around the truck [when] I hit her. There's just no way that I could be sure that I hit her. Schultz didn't think I hit her; I thought I did. . . . [¶] I was more dangerous in them three months in '84 than I ever was in my whole life. . . . [¶] *I meant to hit [Hyde], that's why I shot at her,* but I—I mean I'm surprised that she died." (Italics added.)

### C. *Prior-murder-conviction Special-circumstance Phase*

The parties stipulated that, with the exception of materials relating to the Michigan armed robbery conviction, the jury could consider the "same evidence" introduced at the enhancement phase in determining whether defendant was twice previously convicted of murder for purposes of the two special circumstances alleged under section 190.2, subdivision (a)(2). As noted, such evidence consisted of Michigan records reflecting murder convictions sustained by defendant in 1974 and 1984. Neither party introduced any additional evidence at this phase of trial.

### D. *Penalty Phase*

#### 1. *Prosecution Case.*

In addition to the evidence that had been admitted at prior phases of trial, the prosecution offered certain facts surrounding the 1984 Michigan murder in aggravation at the penalty phase. The medical examiner who performed the autopsy in that case testified that the adult victim, Richard Bryant, died after receiving 64 stab wounds and 2 slash wounds. Diagrams depicting the location of the victim's injuries were admitted. The court also admitted a five-by-seven-inch black and white photograph showing the victim's body after it was cleaned and prepared for the postmortem examination.

In addition, the prosecution introduced documentary proof that defendant had sustained a 1986 conviction in Michigan for being an inmate in possession of a weapon.

#### 2. *Defense Case.*

##### a) *Family life.*

Seven witnesses—aunts, uncles, a sister, and a childhood friend—described defendant's family background and personal history. By all accounts, defendant's mother was an alcoholic who became intoxicated on a daily basis, even while pregnant with defendant. Defendant was born prematurely and suffered low birth weight as a result. His mother reportedly died at age 38 of cirrhosis of the liver.

The testimony was conflicting as to whether defendant's father also suffered from an alcohol problem. However, it was undisputed that the father was absent from the family home during most of defendant's childhood. When they were together, the parents almost always fought. Defendant's

older sister recalled at least one violent, bloody confrontation between her parents.

Defendant was raised in the "Cass Quarters" section of Detroit—a "ghetto" neighborhood apparently known for its rats, prostitutes, and illegal drugs. As a result of money problems and landlord-tenant disputes, the family lived in many different apartments in this neighborhood over the years. Some units were quite small. All were rundown and "filthy."

Although defendant's father was always gainfully employed in the automobile or scrap metal industries, he did not contribute to his children's financial support on a regular basis. Defendant's mother apparently received some financial support from another man, Louie, and bore a son by Louie several years after defendant and his sister were born. The mother purportedly spent any money she received from the children's fathers on herself. Defendant's sister indicated that the children often ate poorly or went hungry.

On occasion, defendant's mother worked as a prostitute. She reportedly entertained customers at home, often in the same room or bed she shared with the children. The mother sometimes instructed defendant to steal money from her customers after they fell asleep or passed out. Defendant's sister testified that she became pregnant at age 13 and that her mother "sold" the baby shortly after it was born.

From the time he first learned to talk, defendant apparently suffered from multiple speech impediments. He mispronounced certain words,[8] and spoke with a "stammer" or "stutter." Many witnesses described defendant as a mentally "slow" child who complained of frequent headaches. He was teased and called "retarded" by his peers.

Family members indicated that the children were rarely shown affection by their mother and that she discouraged their attendance at school. Defendant's mother purportedly hit him with her fists or other objects whenever she felt "hungover" or irritable. The mother routinely entrusted the children to the care of their Aunt Jackie, who is only a few years older than they are.

At age 10, defendant began sniffing glue and other solvents, such as lighter fluid. His relatives knew that he got "high" on a regular basis and that he acted sullen and "strange" as a result. At age 16, defendant worked in a rustproofing plant. On one occasion, he was injured in a chemical explosion

---

[8]For example, defendant's sister testified that defendant would say "streak" when he intended to say "street," and that the word "three" would be mispronounced as "free."

at the plant and remained unconscious for several days. His mother apparently discharged him early from the hospital against the advice of the medical staff. Several witnesses testified that defendant acted "paranoid" after the explosion and that his personality never fully recovered.

b) *Prison life.*

Defendant's Aunt Jackie corresponded with him while he was imprisoned for the 1974 Michigan murder. Jackie testified that defendant "found" Christ during this period but that he "lost" his sense of religion after he was released from prison. A Christian ministries volunteer, Nancy Gramenz, testified that she met defendant in 1986, while he was imprisoned for the 1984 Michigan murder. He expressed an interest in Christianity and the Bible while corresponding and visiting with her.

c) *Expert testimony.*

Dr. Samuel Benson, a psychiatrist specializing in psychopharmacology, testified that he reviewed defendant's school, medical and criminal records, interviewed defendant and several family members, and tested defendant's brain functioning with an electroencephalogram (EEG) and computer assisted tomography (CAT) scan. Based on this information, Dr. Benson determined that defendant suffered from the following interrelated conditions: (1) fetal alcohol syndrome, (2) borderline to moderate mental retardation, (3) general chemical dependency, including use of "almost all" illicit drugs as an adult, (4) organic brain disease, (5) toxic psychosis (based on the incident at the rustproofing plant), and (6) severe parental deprivation, including likely sexual abuse. Overall, the diagnosis that best described defendant was "organic personality syndrome." Dr. Benson implied that this syndrome was linked to defendant's criminal behavior insofar as it resulted in "emotional instability," excessive "aggression," and "impaired social judgment." The witness further suggested that while defendant's behavior was antisocial in nature, the underlying cause was "biological" and therefore beyond his control. Dr. Benson emphasized that defendant probably was born chemically dependent, that he likely used illicit drugs as a result, and that glue sniffing is especially harmful to brain cells.

Dr. William Pierce, a psychologist, subjected defendant to "a battery of psychological tests," interviewed defendant and his family, and apparently reviewed the same reports as Dr. Benson. Dr. Pierce diagnosed defendant as suffering from chronic depression, psychoactive substance dependence (referring to defendant's use of inhalants, mescaline, "LSD," cocaine, marijuana, "PCP," and alcohol), and organic personality syndrome. Significant

themes found to be present in defendant's personality included extreme isolation and poor impulse control. "If things get tight and tough or confusing or perplexing to him, he would act more on emotion than logic . . . ." Dr. Pierce suggested that defendant's various mental disorders were rooted in a family history that was unusually depraved and abusive.

## II. GUILT PHASE ISSUES

### A. *Motion to Suppress*

Defendant claims the trial court erred in denying his pretrial motion to suppress the confessions he separately made while imprisoned in Marquette for the 1984 Michigan murder. For reasons explained further below, we "independently" conclude that the challenged statements were lawfully obtained and properly admitted at trial. (*People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 947 [275 Cal.Rptr. 160, 800 P.2d 516].)

#### 1. *Background.*

The officials to whom defendant confessed, Leffel and Vincent, testified at the suppression hearing. A complete and unedited recording of each confession was also played. (We have listened to the same audiotapes on appeal.) Such evidence disclosed the following undisputed facts:

Leffel worked for the state department of corrections in Michigan. He investigated all forms of prisoner misconduct in Marquette and transmitted evidence of criminal wrongdoing to the state police for further investigation and possible indictment. Leffel recalled that he first met defendant in 1985 while investigating the murder of another inmate, James Schultz. Schultz and defendant were "rap partners" (incarcerated for the same crime), and defendant was a possible witness (not a suspect) in Schultz's murder. Leffel was not a sworn peace officer and had no authority to investigate matters occurring outside prison walls.

Around March 29, 1986, two years after the Barrel House crimes, an unidentified employee in the prison housing unit told Leffel that defendant wished to talk about crimes he committed "on the street." Later the same day, Leffel arranged for defendant to receive a "pass" so that he could walk across the prison yard and meet Leffel in an area where employee offices were located.

As far as Leffel could recall, defendant was not escorted or wearing handcuffs or other restraints when he entered the office. The door was

unlocked throughout the meeting and no one else was present. Leffel testified that defendant "came over on his own and he would have been free to leave on his own" at any time. Before the meeting, Leffel was not aware that defendant had committed any crimes outside of Michigan.

When asked why he was there, defendant said that he wanted to "clear up matters that were bothering him." Before turning on the tape recorder, Leffel warned defendant that any incriminating statements he made would be given to the Michigan State Police, and that defendant could be criminally prosecuted as a result. Consistent with his general practice during inmate interviews, Leffel did not give defendant formal advisements under *Miranda*.

Defendant indicated that he was willing to proceed with his statement notwithstanding Leffel's cautionary remarks. He gave several reasons for doing so, all of which appear on the audiotape. Defendant explained at length that he had been reading the Bible in prison and realized that it was time to "start doing right" and "pay" for his misdeeds. He indicated that such penance was necessary given his "strong feeling" that certain apocalyptic prophecies set forth in the Bible would soon occur. Defendant was certain he could not be linked to the crimes in the absence of a confession. ("[N]o one knows it but me and my partner [and he's] dead.") Defendant also worried that an innocent person might otherwise be charged.

Defendant's audiotaped confession lasted about 30 minutes. In narrative form, defendant gave a detailed account of the crimes he and Schultz committed in Bakersfield two years earlier, including the Barrel House crimes, the two liquor store robberies charged in this case, and several other armed robberies not charged or introduced in the present proceeding. Defendant's factual account was disjointed at times, and some of his words were muffled as an apparent result of his speech impediments. At various times, Leffel interrupted defendant to interject "yeah" or "okay," to repeat a statement defendant had just made, or to ask defendant about an ambiguity in his account.[9] Defendant spoke in a relaxed and confident tone throughout the encounter.

As Leffel had warned, the Michigan State Police soon obtained defendant's confession and relayed the information to Bakersfield police. Detective Vincent immediately realized that the information concerned the Barrel House case, to which he had been assigned two years earlier. Vincent testified that the case was not "closed," but that police had "no leads" as to

---

[9]For the most part, Leffel's questions were limited to the dates and locations of the various crimes and the fate of the victims, namely, whether they were "tied up," robbed of their cash and/or car, or otherwise "hurt."

the identity of the perpetrators and that the investigation had essentially reached a dead end.

On July 29, 1986, four months after the Leffel confession, Detective Vincent arrived at Marquette and interviewed defendant. During the initial, unrecorded moments of this encounter, defendant said that he would not be interviewed unless Vincent "could guarantee him the death penalty."

Vincent testified at the suppression hearing that he gave no such guarantee: "I told [defendant] that I couldn't assure him of that, but I would assure him that we would go for it." In making this statement, Vincent merely intended to inform defendant that "charges would be filed that would make the death penalty applicable," assuming a robbery murder had occurred. According to Vincent, defendant indicated that life behind bars was difficult, but he did not otherwise explain his request for a death sentence.

Following this exchange, Vincent activated the tape recorder and asked defendant about the first liquor store robbery he and Schultz committed in Bakersfield. About 15 minutes later, Vincent realized that he had forgotten to advise defendant of his *Miranda* rights. With the tape recorder still running, defendant received and waived his rights. Defendant then said, "the only reason I'm telling you about everything I committed, officer, is because I don't want no one to be . . . in jail for it . . . [or to be] falsely charged." Otherwise, he explained, "[a]in't no one going to be able to identify us, identify me."

Over the course of the next hour, Vincent questioned defendant about the Barrel House crimes and the second liquor store robbery. As noted earlier, defendant responded with information consistent with his earlier statement to Leffel, except that Vincent received additional details concerning defendant's intent to shoot both Doss and Hyde. Defendant also drew sketches of the various crime scenes and escape routes.

In light of the foregoing evidence, defendant urged the trial court to bar use of both confessions at trial. He argued both orally and in writing that the first confession was involuntary and inadmissible under the Fifth Amendment of the United States Constitution because no effort to comply with *Miranda* was made. As to the second confession, defendant generally claimed that it was "coerced" in violation of the due process and self-incrimination clauses of the federal and state Constitutions. The specific facts and theory underlying the latter claim were not set forth in the written suppression motion. However, defendant argued at the hearing that because he was *Mirandized* only after he had incriminated himself in the first liquor

store robbery, his ensuing waiver was invalid and the entire interview with Detective Vincent was "tainted" and involuntary as a result.

The trial court basically rejected both claims. The court concluded that the first confession was "volunteered" rather than the product of custodial interrogation, and that Leffel therefore was not required to give *Miranda* warnings. In addition, the court allowed admission of most of the second confession, namely, that portion of the Vincent interview that occurred after defendant received and waived his *Miranda* rights. All statements ruled admissible by the court were found to be voluntary even assuming the beyond-a-reasonable-doubt standard applied.[10]

### 2. *Challenge to First Confession.*

Defendant argues here, as below, that his statements to Leffel were inadmissible because they were obtained in violation of *Miranda, supra,* 384 U.S. 436. We disagree.

*Miranda* assumed that "incommunicado interrogation" in a "police dominated atmosphere" is inherently coercive, and that any statement made under such circumstances is not the product of "free choice" unless certain procedural safeguards are followed. Thus, to ensure protection of the United States Constitution, Fifth Amendment right against self-incrimination, any person who is suspected or accused of a crime and who has been taken into custody or otherwise restrained may not be interrogated by the police unless he first knowingly and intelligently waives his right to silence, to the presence of an attorney, and to appointed counsel if indigent. Statements obtained in violation of *Miranda* are not admissible to prove the accused's guilt in a criminal prosecution. (384 U.S. at pp. 444-445, 458, 467, 476 [16 L.Ed.2d at pp. 706-707, 714, 719-720, 724-725].)

For purposes of *Miranda,* custodial interrogation involves "a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 300 [64 L.Ed.2d 297, 307 100 S.Ct. 1682].) In other words, *Miranda* safeguards are required only where the suspect is interrogated, that is, subjected to "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." (446 U.S. at p. 301 [64 L.Ed.2d at p. 308].) No interrogation occurs where the

---

[10]The charged crimes occurred after June 9, 1982, the effective date of the "Truth in Evidence" provision enacted as part of Proposition 8. (See Cal. Const., art. I, § 28, subd. (d); *People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].) As a result, the prosecution was not required to prove voluntariness by a standard more rigorous than that required under the federal Constitution—preponderance of the evidence. (*People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].)

purpose behind *Miranda* is not implicated—preventing government officials from exploiting the "coercive nature of confinement to extract confessions that would not [otherwise] be given." (*Arizona* v. *Mauro* (1987) 481 U.S. 520, 530 [95 L.Ed.2d 458, 468, 107 S.Ct. 1931].)

■ It follows that not all statements obtained by the police from a suspect who is incarcerated or otherwise confined are the product of interrogation. Nothing in *Miranda* is intended to prevent, impede, or discourage a guilty person, even one already confined, from freely admitting his crimes, whether the confession relates to matters for which he is already in police custody or to some other offense. As *Miranda* itself recognized, "[c]onfessions [are] a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment" or subject to the prophylactic requirements of *Miranda*. (*Miranda*, *supra*, 384 U.S. at p. 478 [16 L.Ed.2d at p. 726], fn. omitted; accord, *Rhode Island* v. *Innis*, *supra*, 446 U.S. 291, 299-300 [64 L.Ed.2d 297, 306-307].)

■ ■ . Here, as in other cases, we conclude that defendant's incriminatory statements were not elicited as the result of interrogation. (E.g., *People* v. *Edwards* (1991) 54 Cal.3d 787, 815-816 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 651 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 274-275 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Siegenthaler* (1972) 7 Cal.3d 465, 470 [103 Cal.Rptr. 243, 499 P.2d 499].) First, defendant initiated contact with prison officials in Michigan in order to discuss crimes that had occurred in Bakersfield and about which they were unaware. At the time of such contact, the crimes were two years old, and defendant was already imprisoned for life in an unrelated case. As defendant had correctly surmised before speaking with Leffel, he had never been identified as a suspect in the Bakersfield crimes, and the investigation had long since stalled. It is reasonable to infer that defendant might have escaped prosecution had he not come forward and admitted his guilt.

Second, defendant volunteered this information for reasons that were entirely personal. Defendant, a twice convicted murderer, was familiar with the criminal justice system and undoubtedly knew that any incriminating

statements he made would be forwarded by prison officials to the appropriate law enforcement agency. Indeed, Leffel warned defendant of this possibility. Defendant nonetheless chose to confess as the result of an apparent religious conversion in prison and the need to clear his conscience. Thus, prison officials exerted no influence on him to discuss or admit the crimes charged in this case.

Defendant suggests that even though he voluntarily initiated contact with prison officials, the encounter with Leffel became coercive at some unspecified point because Leffel asked questions. Defendant contends that statements made by a person in custody are not "volunteered" and exempt from *Miranda* unless the police remain completely silent and "merely listen."

Defendant is mistaken. Just as custodial interrogation can occur in the absence of express questioning (*Rhode Island* v. *Innis, supra,* 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308]), not all questioning of a person in custody constitutes interrogation under *Miranda.* (*People* v. *Wader* (1993) 5 Cal.4th 610, 637 [20 Cal.Rptr.2d 788, 854 P.2d 80]; e.g., *People* v. *Lewis, supra,* 50 Cal.3d 262, 274-275; *People* v. *Claxton* (1982) 129 Cal.App.3d 638, 647, 653-655 [181 Cal.Rptr. 281].) Here, Leffel did not influence the manner in which defendant reported the crimes. The entire confession was given in narrative, almost rambling form. To the extent Leffel interrupted and asked questions, they were merely "neutral inquir[ies]" made for "the purpose of clarifying [statements] or points that [he] did not understand." (*People* v. *Claxton, supra,* 129 Cal.App.3d 638, 647, 653.) Nothing in the substance or tone of such inquiries was reasonably likely to elicit information that defendant did not otherwise intend to freely provide. Thus, the trial court properly found that defendant's first confession in Marquette was not obtained in violation of *Miranda* and that such evidence could be admitted at trial.[11]

### 3. *Challenge to Second Confession.*

The record shows that, four months after he confessed to Leffel, defendant offered to discuss the Bakersfield crimes with Detective Vincent "only" if

---

[11]Defendant relies heavily on a 28-year-old case, *People* v. *Matthews* (1968) 264 Cal.App.2d 557 [70 Cal.Rptr. 756]. In *Matthews,* the court indicated that even where a suspect "initiates" contact with the police and "offers" to confess in custody, his statements are not "volunteered" or voluntary under the Fifth Amendment of the United States Constitution unless the police remain "purely passive" and ask no questions. (*Id.* at pp. 566-567.) However, subsequent developments in the law do not support such a rigid approach. As noted earlier, the presence or absence of express questioning is not dispositive as to whether interrogation has occurred. In determining whether the prophylactic requirements of *Miranda* apply, the purpose—not the form—of police interaction with a criminal suspect controls. Because prison officials did not attempt to elicit incriminating statements that defendant otherwise would not have made, the trial court properly determined that no *Miranda* violation occurred in the present case.

Vincent "guaranteed" that the death penalty would ultimately be imposed. Defendant now claims that Vincent granted this request, and that the second confession was involuntary because it was given in exchange for an official "promise" of a desired outcome or "benefit."[12]

The claim has been waived. As noted, defendant urged the trial court to suppress the second confession solely on grounds that Vincent's delay in advising defendant of his *Miranda* rights tainted the entire interview under the Fifth Amendment, including those statements made after a *Miranda* waiver was obtained. No question of a death penalty "guarantee" or other improper inducement was mentioned in defendant's suppression motion or argued at the hearing. As a result, the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings. Under such circumstances, a claim of involuntariness generally will not be addressed for the first time on appeal. (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 172 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 519 & fn. 5 [3 Cal.Rptr.2d 677, 822 P.2d 385]; cf. *In re Cameron* (1968) 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633].)

Defendant insists that any failure by trial counsel to adequately preserve his current challenge to the second confession amounts to ineffective assistance in violation of his right to counsel under both the federal and state Constitutions. We disagree. So far as the record on appeal discloses and for reasons we explain, mention of the death penalty prior to the second confession was not coercive, and the suppression motion could not properly have been granted on this ground. We therefore cannot conclude that trial counsel was incompetent in failing to raise the issue. (See, e.g., *People* v. *Lucas* (1995) 12 Cal.4th 415, 441-442 [48 Cal.Rptr.2d 525, 907 P.2d 373] [rejecting incompetence claim based on trial counsel's failure to argue that interrogating officers threatened defendant with the death penalty].)

 In general, " 'any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law.' " (*People* v. *Hogan* (1982) 31 Cal.3d 815, 838 [183 Cal.Rptr. 817, 647 P.2d 93], quoting

---

[12]Defendant appears to base this claim here, as in the trial court, on both the federal and state Constitutions. It is an open question, however, whether Proposition 8 (see fn. 10, *ante*) altered California law insofar as it has traditionally barred admission of coerced confessions at trial, including those obtained by official promises of leniency or benefit. Because neither party has briefed the issue and because coerced confessions are inadmissible under federal constitutional principles, we do not separately address the state law question here. (See *People* v. *Cahill* (1993) 5 Cal.4th 478, 485-486 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].) In identifying the circumstances under which this rule applies, we have made clear that investigating officers are not precluded from discussing any "advantage" or other consequence that will "naturally accrue" in the event the accused speaks truthfully about the crime. (*People* v. *Hill* (1967) 66 Cal.2d 536, 550 [58 Cal.Rptr. 340, 426 P.2d 908].) The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable. (*People* v. *Thompson* (1990) 50 Cal.3d 134, 166-167 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Hogan, supra*, 31 Cal.3d 815, 841; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 607 [147 Cal.Rptr. 172, 580 P.2d 672].)

Contrary to what defendant implies, a confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand. (E.g., *People* v. *Benson* (1990) 52 Cal.3d 754, 780-782 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Thompson, supra*, 50 Cal.3d 134, 169-170; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 773-774 [248 Cal.Rptr. 126, 755 P.2d 310].) We have found a constitutional violation in this context only where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises. (E.g., *People* v. *Jimenez, supra*, 21 Cal.3d 595, 609-613 [defendant admitted involvement in robbery murder after police indicated he could not otherwise avoid the death penalty or receive less severe punishment than a codefendant, even though police knew the codefendant was the actual killer]; *People* v. *McClary* (1977) 20 Cal.3d 218, 227-229 [142 Cal.Rptr. 163, 571 P.2d 620] [16-year-old girl admitted involvement in murder after police repeatedly denied her requests for an attorney, challenged her claim of innocence, falsely stated she was eligible for the death penalty, and offered leniency if she "changed" her "story"]; *People* v. *Johnson* (1969) 70 Cal.2d 469, 478-479 [74 Cal.Rptr. 889, 450 P.2d 265] [Black suspect under age 21 admitted involvement in robbery murder after police indicated the jury would otherwise disbelieve defendant's denial, assume he harbored "hatred" towards the White victim, and impose the death penalty].)

Such coercion is lacking here. Detective Vincent initiated no discussion concerning the penal consequences of any statement defendant might make. Rather, *defendant* spontaneously requested a death sentence at the outset of the interview. He also indicated a willingness to tell the truth in order to ensure that justice was served and that no one else was "falsely charged." These facts strongly suggest that defendant volunteered for the most severe

penalty available under California law because he honestly believed such punishment was warranted given his involvement in the Barrel House crimes and several other violent robberies in Bakersfield.

Moreover, Detective Vincent made no promises or threats of any kind. His one-sentence response about the death penalty merely alluded to what any person, including a convicted felon, would reasonably assume to be true—that authorities would be interested in pursuing a death sentence in any serious murder case in which it might apply. Vincent did not state or imply that the death penalty would necessarily be imposed, even assuming defendant desired such a result. On the other hand, no suggestion was made that defendant could avoid serious punishment by cooperating with police.

Thus, under the circumstances presented here, defendant's second confession in Marquette was entirely the product of his free will. As with the earlier confession to Leffel, the "motivating cause" appears to be a sincere and reasoned desire on defendant's part to atone for his life of crime. (*People* v. *Brommel*, *supra*, 56 Cal.2d 629, 632.) Unlike other cases in which official coercion has been found, there is no evidence that defendant was frightened by his contact with law enforcement officers or that he falsely confessed to ensure a particular outcome or to minimize the punishment he might otherwise receive. We therefore cannot conclude that trial counsel was incompetent in failing to claim that the second confession was induced by threats or promises concerning the death penalty.

## B. *Corpus Delicti*

The parties agree that the corpus delicti rule—which essentially precludes conviction based solely on a defendant's out-of-court statements—applies to the robbery-murder special-circumstance allegation as well as to the substantive crimes charged in this case. (*People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887]; see also *People* v. *Wright* (1990) 52 Cal.3d 367, 403-405 [276 Cal.Rptr. 731, 802 P.2d 221].)[13] The jury received such an instruction here. The prosecutor also explained the significance of the corpus delicti rule to the jury, and argued that its requirements had been met in every respect.

Defendant now claims that apart from his pretrial confessions to Michigan and Bakersfield officials in prison, no evidence was introduced

---

[13]After trial in this case, California voters enacted section 190.41 as part of Proposition 115. The new statute overturns *People* v. *Mattson, supra*, 37 Cal.3d 85, 93-94, and provides that the corpus delicti of any felony-based special circumstance set forth in section 190.2, subdivision (a)(17) need not be proven independently of the defendant's extrajudicial statements. Section 190.41 applies to crimes committed after it became effective on June 6, 1990. (*People* v. *Mickle* (1991) 54 Cal.3d 140, 179, fn. 22 [284 Cal.Rptr. 511, 814 P.2d 290]; *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 297-299 [279 Cal.Rptr. 592, 807 P.2d 434].)

from which the jury could conclude that Hyde was murdered during the course of an attempted robbery. Defendant insists that his rights to due process and a reliable death judgment under the federal Constitution require that we reverse the attempted robbery convictions, set aside the robbery-murder special circumstance finding, and vacate the death judgment. We decline to do so.

The corpus delicti rule requires the prosecution to prove that "the charged crime actually happened" exclusive of the accused's extrajudicial statements. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 368 [279 Cal.Rptr. 780, 807 P.2d 1009].) Only a "slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient." (*People* v. *Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126]; accord, *People* v. *Jennings*, *supra*, 53 Cal.3d 334, 368.) Such evidence need not point to defendant as the perpetrator. (*People* v. *Wright*, *supra*, 52 Cal.3d 367, 404.)

Here, there was adequate evidence apart from defendant's own statements that the victims were assaulted during the course of an attempted robbery. The surviving victim, Doss, testified that two armed men wearing "fatigues" approached the victims as they emerged from a busy place of entertainment late one night. Because Doss identified the men as strangers and because the police uncovered no information linking them to Hyde, a strong inference was raised that the victims were selected at random. According to Doss, the gunmen behaved in a purposeful fashion and immediately ordered the victims to retreat to a more obscure area of the parking lot. Doss was shot when he resisted, and Hyde was gunned down as she attempted to escape.

Since the jury could reasonably conclude the perpetrators intended to steal the victims' property at gunpoint, the corpus delicti rule is satisfied insofar as it required independent proof of attempted robbery. We reach no different conclusion, even though the evidence does not eliminate the inference that additional or different crimes were intended.

C. *Juror Note*

In a brief discussion held outside the jury's presence shortly before instructions were given, the trial court told all counsel about a note the court had apparently received the previous day from Juror Ruggles. According to the court, the note stated that the daughter of victim Mark Doss was a senior at the high school where Juror Ruggles worked, but that Ruggles and the daughter had never talked "about the case." The note further indicated that Ruggles did not become aware of "any connection" until Doss testified at

trial, and that he (Ruggles) "just wanted [the court and counsel] to know about it."

In response, defense counsel informed the court that he already knew about the note and saw no "reason to inquire." Counsel explained that the fact that Juror Ruggles, a guidance counselor, was "familiar with the [Doss] name is not surprising, and his statement that he's never talked to [the daughter] about [the case] satisfied" the defense. The prosecutor made no comment about the Ruggles note, and the matter was not pursued. For reasons that are unclear, a copy of the note is not included in the record.

Defendant argues that notwithstanding counsel's contrary position at trial, the court was required to inquire into "possible bias" on the part of Juror Ruggles. Defendant speculates that there may have been a "professional relationship" between Ruggles and Doss's daughter, and that Ruggles may have been unduly sympathetic towards the prosecution as a result. In defendant's view, the court violated a duty under state law to determine whether there was "good cause" to believe that Ruggles was "unable to perform his duty" as a juror. (§ 1089.)[14] We are also asked to "presume" that defendant was prejudicially denied his rights to an impartial jury and a reliable death judgment under the federal Constitution.

The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. (*People* v. *Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.

As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. (E.g., *People* v. *Burgener* (1986) 41 Cal.3d 505, 516-521 [224 Cal.Rptr. 112, 714 P.2d 1251] [hearing required where foreman informed court that juror was intoxicated more than once during trial]; cf. *People* v. *Davis* (1995) 10 Cal.4th 463, 546-548 [41 Cal.Rptr.2d 826, 896 P.2d 119] [no hearing required absent evidence that foreman's note was the product of improper discussion among jurors]; *People* v. *Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204] [no hearing required

---

[14]Section 1089 states in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, . . . the court may order him to be discharged and [replaced by] an alternate [juror]."

absent evidence juror was actually asleep during trial]; *People* v. *Kaurish* (1990) 52 Cal.3d 648, 694 [276 Cal.Rptr. 788, 802 P.2d 278] [no hearing required absent evidence juror's derogatory remark reflected bias against the defense as opposed to impatience with the proceedings]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 252-253 [253 Cal.Rptr. 55, 763 P.2d 906] [no hearing required absent evidence jurors actually read newspaper articles about the case].) A juror who is acquainted with the victim's family as the result of a business or professional relationship is not necessarily incompetent to serve in a capital case. (E.g., *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1174-1175 [9 Cal.Rptr.2d 834, 832 P.2d 146] [upholding retention of juror who was currently involved with the victim's husband in a real estate deal].)

No evidence of juror bias was presented here. The court learned that Juror Ruggles worked at the same high school attended by Doss's daughter. However, nothing in the note indicated that Ruggles had developed special feelings toward the Doss family or that he had worked with the Doss child at school. Indeed, by stating that no discussions about the case had occurred, the note could be read to suggest that Ruggles and the daughter were not personally acquainted with one another and that they had no occasion to talk about the case. So far as the record discloses, the note contained no information from which the court could infer that Ruggles was biased against the defense or favored the prosecution.

The manner in which the foregoing information surfaced supports this determination. If Juror Ruggles had formed improper opinions about the case and intended to act in ways prejudicial to the defense, common sense suggests that he would have simply remained silent. The fact that Ruggles voluntarily came forward after Doss's testimony and revealed a possible "connection" to the Doss family indicates that his failure to mention the information earlier was inadvertent, and that he was attempting to perform his duties in good faith. Under the circumstances, the clear inference of the note was that Ruggles could remain impartial in the case. The court did not abuse its discretion in concluding that no further inquiry into the matter was necessary.

### D. *Instructional Claims*

#### 1. *Flight.*

Defendant claims the court erred in giving the standard instruction on flight over his objection at trial. We disagree.

The jury received CALJIC No. 2.52, which provides that flight "immediately after the commission of a crime . . . is not sufficient in itself to

establish . . . guilt, but is a fact which, if proved, may be considered . . . in the light of all other proved facts in deciding . . . guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." In general, such an instruction is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt. (§ 1127c; *People* v. *Jones* (1991) 53 Cal.3d 1115, 1145 [282 Cal.Rptr. 465, 811 P.2d 757]; *People* v. *Mason* (1991) 52 Cal.3d 909, 943 [277 Cal.Rptr. 166, 802 P.2d 950]; *People* v. *Turner* (1990) 50 Cal.3d 668, 694-695 [268 Cal.Rptr. 706, 789 P.2d 887].)

As defendant seems to concede, substantial evidence of guilty flight was presented here. The jury learned that the shootings occurred when the victims thwarted a plan by defendant and Schultz to steal a car and rob the Barrel House. Both perpetrators immediately fled the scene in an obvious attempt to avoid detection and arrest. In defendant's own words, he intentionally shot the second victim, Hyde, while he (defendant) was "running away" in the direction of a prearranged "escape route." Moreover, defendant and Schultz feared arrest and remained in Bakersfield only until they had committed another robbery and obtained enough cash to return to Michigan. Thus, the jury could reasonably infer that defendant displayed guilty knowledge by fleeing the crime scene and hastily traveling across country to the relative safety of his home state.

 Defendant argues, however, that evidence of flight is irrelevant and prejudicial where, as here, the defendant does not vigorously dispute commission of the charged acts and where his mental state at the time of the crimes is the primary issue disputed at trial.[15] Although defendant's reasoning is not entirely clear, he asserts that the flight instruction could only have confused the jury and caused it to "presume" the existence of particular criminal intents, such as the intent to kill Hyde, in violation of his right to due process and to a reliable death judgment under the federal Constitution.

We have rejected similar challenges to CALJIC No. 2.52 and to analogous instructions concerning a defendant's false or misleading pretrial statements

---

[15]The murder charged in this case occurred after *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], but before *Carlos* was overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. Thus, intent to kill was an element of the robbery-murder special circumstance, even though the evidence established that defendant was the actual killer and not merely an aider and abettor. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973 & fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131]; *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].) In closing argument, the prosecution reviewed the evidence as it related to all elements of the charged crimes, while defense counsel argued that the killing was not proven to be intentional beyond a reasonable doubt for purposes of the robbery-murder special-circumstance allegation. However, counsel did not concede defendant's involvement in the crimes or the truth of his confessions. We note that the jury received a *"Carlos"* instruction and specifically found that defendant acted with the intent to kill Hyde.

(CALJIC No. 2.03) and suppression of evidence (CALJIC No. 2.06). In addressing the latter two instructions, *People* v. *Crandell* (1988) 46 Cal.3d 833 [251 Cal.Rptr. 227, 760 P.2d 423], observed that a reasonable jury, advised that the defendant's conduct could be considered as " 'consciousness of *guilt,*' " would understand the phrase to mean only " 'consciousness of some wrongdoing,' " not consciousness of each and every element of the charged offense. (*Id.* at p. 871, italics added.) Similarly, CALJIC No. 2.52 indicates that evidence of flight "may" bear on "guilt." Nothing in the instructions approved in *Crandell* or challenged in the present case "address-[es] the defendant's mental state at the time of the offense [or] direct[s] or compel[s] the drawing of impermissible inferences in regard thereto." (46 Cal.3d at p. 871; accord, *People* v. *Breaux* (1991) 1 Cal.4th 281, 303-304 [3 Cal.Rptr.2d 81, 821 P.2d 585] [CALJIC Nos. 2.03 & 2.06]; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 579-580 [286 Cal.Rptr. 628, 817 P.2d 893] [CALJIC Nos. 2.03 & 2.52].)

Moreover, even though defendant confessed to the crimes before trial and counsel focused on the robbery-murder special-circumstance allegation in closing argument, "the fact remained that defendant did not plead guilty to any of the charges [arising out of the Barrel House incident] and the jury had before it the issue of guilt on all [such] charges." (*People* v. *Breaux, supra,* 1 Cal.4th 281, 304.) The prosecution was entitled to instructions advising jurors on how to evaluate evidence bearing on all facts that had to be proven beyond a reasonable doubt. The trial court therefore did not err in giving CALJIC No. 2.52.

### 2. *Reasonable Doubt.*

The jury in this case received CALJIC No. 2.90, the standard instruction providing that a criminal defendant is presumed innocent and that the prosecution must prove guilt beyond a reasonable doubt. The instruction is patterned upon statutory language in existence since 1927 and through the time of defendant's trial. (§ 1096.) At issue is language in the instruction defining reasonable doubt in terms of "moral evidence" and "moral certainty."[16]

Defendant asserts in his opening brief on appeal that this language permits conviction based upon a degree of proof lower than that required under the

---

[16]Defendant's jury was instructed in pertinent part: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, *and depending on moral evidence,* is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty,* of the truth of the charge." (CALJIC No. 2.90, italics added.)

due process clause of the federal Constitution. (See *Cage* v. *Louisiana* (1990) 498 U.S. 39, 41 [112 L.Ed.2d 339, 342, 111 S.Ct. 328].) In his reply brief, however, defendant concedes that the high court has since rejected a similar challenge to the same jury instruction. (*Victor* v. *Nebraska* (1994) 511 U.S. 1, __ [127 L.Ed.2d 583, 591-597, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862].) In *Victor* v. *Nebraska*, the court acknowledged that the challenged phrases, when viewed in isolation, are antiquated and add nothing to a modern jury's understanding of reasonable doubt. The court also cautioned that the "common meaning of [such terms] . . . may continue to [change] to the point that" the instruction becomes unconstitutional. (511 U.S. at p. __ [127 L.Ed.2d at p. 597].) Nevertheless, when the instructional language is considered as a whole, CALJIC No. 2.90 is not so unclear as to impermissibly dilute the prosecution's burden of proof. (*Ibid.*)

While modification of the instruction may be appropriate in light of the high court's concerns (*People* v. *Freeman* (1994) 8 Cal.4th 450, 504 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]), we have consistently upheld use of the traditional definition of reasonable doubt in capital trials. (E.g., *People* v. *Stanley* (1995) 10 Cal.4th 764, 797 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People* v. *Davis, supra,* 10 Cal.4th 463, 520-521; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 142-144 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Webb* (1993) 6 Cal.4th 494, 531 [24 Cal.Rptr.2d 779, 862 P.2d 779]; *People* v. *Jennings, supra,* 53 Cal.3d 334, 385-386.) We decline to reconsider these decisions or reach a contrary result here. Defendant's claim of instructional error therefore fails.[17]

### 3. *Circumstantial Evidence.*

Various standard instructions given at the guilt, enhancement, and special circumstance phases describe the conditions under which circumstantial evidence is sufficient to prove guilt of the charged crimes (CALJIC No. 2.01), specific intent (CALJIC No. 2.02), and the truth of the enhancement and special circumstance allegations (CALJIC No. 8.83). ▇▇▇ The language of these instructions overlaps to some extent, and each contains the

---

[17]Following the decisions in *Victor* v. *Nebraska, supra,* 511 U.S. 1 and *People* v. *Freeman, supra,* 8 Cal.4th 450, the Legislature modified the reasonable doubt statute and deleted the phrases, "and depending on moral evidence," and "to a moral certainty." (Stats. 1995, ch. 46, § 1.) As amended, section 1096 states in pertinent part: "Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

following charge: "If . . . one interpretation of [the] evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."[18]

Defendant suggests that the foregoing language undermined the constitutional requirement of proof beyond a reasonable doubt because it directed jurors to accept a guilty interpretation of the evidence as long as it seemed "reasonable." Here, as in other cases, we reject the claim. The challenged instructions made clear that "circumstantial evidence is sufficient to prove guilt only if it 'cannot be reconciled with any other rational conclusion.' The words 'rational' and 'reasonable' in the context of [these instructions] must be read in conjunction with the instruction on reasonable doubt (CALJIC No. 2.90). [Citation.] That instruction informs the jurors that in the event they harbor a reasonable doubt concerning guilt, they are required to acquit. . . . [¶] . . . Thus, the jury properly can find the prosecution's theory as to the interpretation of the circumstantial evidence 'reasonable' and alternate theories favorable to the defense 'unreasonable,' within the meaning of these instructions, only if the jury is convinced beyond a reasonable doubt of the accuracy of the prosecution's theory. [Citation.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; accord, *People v. Crittenden, supra,* 9 Cal.4th 83, 144; *People v. Johnson* (1992) 3 Cal.4th 1183, 1234 [14 Cal.Rptr.2d 702, 842 P.2d 1].) No instructional error occurred.

### E. *Cumulative Effect of Trial Court Rulings*

Defendant contends that "multiple errors" committed by the trial court at the guilt phase resulted in "cumulative" prejudice and require reversal of the judgment. As we have explained, however, none of defendant's evidentiary or instructional claims has merit. In addition, the court did not err in its handling of the note received from Juror Ruggles. We therefore cannot conclude that affirmance of the guilt judgment on appeal results in a miscarriage of justice under the state Constitution, or violates defendant's rights to due process and a reliable death judgment under the federal Constitution.

### III. PENALTY PHASE ISSUES

### A. *Proof of Factor (b) Crimes*

The prosecution offered four Michigan crimes in aggravation at the penalty phase: second degree murder for which defendant was convicted in

---

[18]The trial court gave a similar, special instruction concerning the evaluation of circumstantial evidence introduced in aggravation at the penalty phase under section 190.3, factor (b) (other violent criminal activity) and factor (c) (prior felony convictions).

December 1974 (the 1974 murder), armed robbery for which defendant was convicted in November 1984 (the robbery), first degree murder for which defendant was convicted in December 1984 (the 1984 murder),[19] and being an inmate in possession of a weapon for which defendant was convicted in January 1986 (the inmate-weapons offense). Because only the 1974 murder gave rise to a conviction sustained "prior" to defendant's commission of the capital crimes, such conviction was the only one offered under section 190.3, factor (c). (*People* v. *Balderas* (1985) 41 Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480].) However, the prosecution asked the jury to consider all four Michigan crimes under section 190.3, factor (b) as criminal activity involving the use or threat of violence. (*Balderas, supra,* at p. 202.) As to each factor (b) crime, the prosecution relied solely on the judgment of conviction to prove that defendant had in fact committed the underlying violent criminal conduct. In addition, testimonial and photographic evidence established that the victim of the 1984 murder had sustained 66 knife wounds.

██ On appeal, defendant claims admission of the robbery and inmate-weapons convictions violated the hearsay rule insofar as such evidence was offered under section 190.3, factor (b) to prove that the conduct adjudicated therein actually occurred. (See Evid. Code, § 1200.) Because a conviction was also the sole means used to establish defendant's involvement in the 1984 murder, defendant complains—again on hearsay grounds—that an inadequate foundation had been laid for admitting additional evidence concerning the brutal nature of that killing. Defendant argues that trial counsel should have moved to exclude the convictions on such grounds below, and that his failure to do so amounted to ineffective assistance under the federal and state Constitutions. We disagree.

██ In general, reviewing courts defer to trial counsel's tactical decisions in assessing a claim of ineffective assistance, and the burden rests on the defendant to show that counsel's conduct falls outside the wide range of competent representation. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694-695, 104 S.Ct. 2052]; *People* v. *Lucas, supra,* 12 Cal.4th 415, 436-437.) In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 980 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Defendant fails to make such a showing here. ██ It was settled at the time of his penalty trial in 1989 that section 190.3, factor (b) permitted

---

[19]In this section of the text, we refer to defendant's most recent Michigan murder conviction as the "1984 murder." Elsewhere, however, the opinion refers to the same crime as the "1984 Michigan murder" to avoid confusing it with the 1984 capital crimes that are the subject of this appeal.

evidence of violent criminality committed at any time in the defendant's life, and whether or not adjudicated, to show his propensity for violence and to assist the sentencer in determining whether he is the type of person who deserves to die. (*People* v. *Karis* (1988) 46 Cal.3d 612, 639-640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Balderas, supra,* 41 Cal.3d 144, 202.) The prosecution may prove commission of such conduct by any competent means, and may also place the incident "in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness." (*People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741]; accord, *People* v. *Keenan* (1988) 46 Cal.3d 478, 526-527 [250 Cal.Rptr. 550, 758 P.2d 1081].) The trial court has no discretion to exclude such incidents under Evidence Code section 352 on the ground they are substantially more prejudicial than probative at the penalty phase. (*People* v. *Karis, supra,* 46 Cal.3d 612, 641.) Nor is the defendant entitled to preclude admission of the graphic or sordid details of his factor (b) crimes by stipulating to any resulting conviction or to a sanitized version of the facts surrounding the offense. (*People* v. *Karis, supra,* 46 Cal.3d at pp. 638-640; *People* v. *Brown* (1988) 46 Cal.3d 432, 445 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People* v. *Melton, supra,* 44 Cal.3d 713, 754; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].)

 Against this backdrop, counsel could reasonably believe he had nothing to gain and much to lose by interfering with the prosecution's attempt to prove defendant's numerous other violent crimes primarily by means of his felony convictions. Even assuming the trial court could properly sustain a defense objection of the sort now urged on appeal, the prosecution would have been free to establish defendant's commission of the Michigan crimes and the surrounding circumstances through the testimony of victims and witnesses and any physical and photographic evidence. Trial counsel might have known or reasonably assumed that a "mini-trial" of this sort could be far more damaging to the defense than allowing the jury to learn of the conduct through the bare fact of a conviction. The record does not eliminate the possibility that, based on such tactical concerns, counsel decided to waive any hearsay objection and allow the prosecution to use defendant's various convictions to prove he committed the underlying violent criminal activity. For this reason, we reject defendant's claim of ineffective assistance of counsel.

### B. *Circumstances of 1984 Michigan Murder*

The penalty jury learned from the record of conviction that the 1984 Michigan murder occurred two and one-half weeks before the capital crimes, and that defendant's partner in the capital crimes, James Schultz, was

convicted of the same Michigan murder. The prosecution in the present case also admitted testimonial and photographic evidence that Bryant, the victim of the 1984 Michigan murder, sustained 66 knife wounds over his entire body. However, no evidence was introduced as to who inflicted such injuries—defendant, Schultz, or both men.

 Defendant argues that, absent evidence that he personally inflicted any of Bryant's wounds, admission of the "shocking details" of the murder violated the requirement of an individualized and reliable sentencing determination under the Eighth Amendment. (See *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978].) Defendant insists that the jury must have assumed he was the actual killer as opposed to an aider and abettor or coconspirator, and that the penalty determination therefore was based on an unsubstantiated and exaggerated view of his "moral culpability" for the crime. In the alternative, defendant claims counsel was ineffective in failing to raise such an objection at trial.

However, nothing in the relevant statutory or constitutional principles requires the prosecution to establish that the defendant personally committed each and every act occurring during a violent criminal episode admitted under section 190.3, factor (b). The sentencer in a capital proceeding is entitled to know about other incidents involving the use or threat of violence for which the defendant is shown to be criminally liable beyond a reasonable doubt, whether he participated as an actual perpetrator or in some other capacity. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 136-137 [2 Cal.Rptr.2d 335, 820 P.2d 559] [applying factor (b) to violent crimes committed by another person and for which defendant "could have been liable as an accomplice"].) As long as penalty jurors are not materially misled about the nature and degree of the defendant's individual culpability, the prosecution may rely solely on a judgment of conviction to establish his involvement in a joint crime of violence. (See *People* v. *Hayes* (1990) 52 Cal.3d 577, 632-633 [276 Cal.Rptr. 874, 802 P.2d 376] [upholding use of juvenile court records to prove defendant committed manslaughter under factor (b) even though jury never learned whether defendant was the actual perpetrator or an aider and abettor].)

Here, the evidence established that defendant and Schultz were each convicted of murdering Bryant, that both men were presumably present when the murder occurred, and that the murder was unusually violent and close in time to the capital crimes. In closing argument, the prosecutor did not state or imply that defendant actually stabbed or killed Bryant or that the victim's numerous knife wounds had any bearing on the relative culpability of defendant and Schultz. The prosecutor simply urged jurors to find defendant guilty of the Bryant murder and to consider this brutal homicide in

conjunction with other evidence of defendant's violent criminality in determining the appropriate penalty.

In response, defense counsel conceded that defendant and Schultz were both "legally culpable" for the killing, but argued that its violent nature should not be considered in aggravation because the prosecution failed to prove that defendant "was the person [who] inflicted" Bryant's wounds. Counsel essentially urged jurors to infer from the lack of such evidence that Schultz was the actual killer. Under the circumstances, there is little chance the jury ascribed to defendant a personal role in the 1984 Michigan murder beyond that demonstrated by the evidence.

## C. *Future Dangerousness*

In closing argument, the prosecutor observed that defendant had committed his first murder at age 18, and that he participated in 2 additional homicides—the 1984 Michigan murder and the capital crimes—shortly after he finished serving a prison term for the first murder. The prosecutor predicted that defendant, who was 33 years old at the time of trial, would continue to commit acts of violence even if incarcerated for the rest of his natural life. The prosecutor reminded the jury that defendant had already committed at least one crime involving the threat of violence as an inmate— possession of a weapon: "He's a threat to the other inmates. He's a threat to the guards as long as he remains in that prison given his background. What does he have to lose? He [was] doing one life without parole sentence when he was found in possession of the weapon[.] [I]f you give him [another life sentence,] he has absolutely nothing to lose. . . . [L]ife without parole is not appropriate in this case." Defendant timely but unsuccessfully objected to the foregoing remarks at trial.

Defendant contends that prosecutorial argument on his future dangerousness in prison was inherently "offensive" under the Fifth and Eighth Amendments of the United States Constitution because capital defendants are "powerless" to introduce rebuttal argument or evidence under state law. He relies on a line of cases prohibiting the defense from introducing evidence at the penalty phase concerning the daily routine and general conditions of confinement for inmates sentenced to life imprisonment without possibility of parole. (E.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1117 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Daniels* (1991) 52 Cal.3d 815, 876-878 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Thompson* (1988) 45 Cal.3d 86, 138-139 [246 Cal.Rptr. 245, 753 P.2d 37].)

Such authorities are inapposite here. Evidence concerning the rigors of confinement has no bearing on the character or background of the individual

offender or the circumstances of the capital offense. It is therefore irrelevant and inadmissible under section 190.3, factor (k). (*People* v. *Thompson*, *supra*, 45 Cal.3d 86, 139.) However, the same prohibition does not apply where a capital defendant seeks to inform the sentencer of his good behavior as an inmate or of his suitability as a life prisoner. ▮ "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) *must* be considered potentially mitigating. Under *Eddings* [v. *Oklahoma* (1982) 455 U.S. 104 (71 L.Ed.2d 1, 102 S.Ct. 869)], such evidence may not be excluded from the sentencer's consideration." (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 5 [90 L.Ed.2d 1, 7, 106 S.Ct. 1669], fn. omitted and italics added; e.g., *People* v. *Fudge*, *supra*, 7 Cal.4th 1075, 1117 [error to exclude evidence that defendant would lead a productive and nonviolent life in prison]; *People* v. *Garceau* (1993) 6 Cal.4th 140, 204 [24 Cal.Rptr.2d 664, 862 P.2d 664] [defendant allowed to present evidence and argument of his successful adjustment to prison].) Thus, defendant was not precluded by law from disputing the prosecution's claim that he was prone to violence in prison. The prosecutor's argument therefore was not improper on this ground.

Moreover, we have repeatedly declined to find error or misconduct where argument concerning a defendant's future dangerousness in custody is based on evidence of his past violent crimes admitted under one of the specific aggravating categories of section 190.3. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 248-249 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Taylor* (1990) 52 Cal.3d 719, 749-750 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1122-1123 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) Contrary to what defendant claims, ample evidence supported such an argument here. The prosecutor properly asked the jury to infer from defendant's numerous crimes of violence, including three murders, multiple robberies, and the inmate-weapons offense, that he was inherently dangerous and unlikely to change if sentenced to life imprisonment without parole.

D. *Instructional Claims*

1. *Consequences of Decision.*

In its initial instruction at the penalty phase, the trial court admonished jurors that "[b]oth the People and [the] defendant have the right to expect that you will conscientiously consider and weigh the evidence, apply the law, and *reach a just verdict regardless of the consequences.*" (Italics added.) Defendant claims this instruction minimized the gravity of the penalty decision in violation of the Eighth Amendment. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-330 [86 L.Ed.2d 231, 238-240, 105 S.Ct. 2633].) No prejudicial error occurred.

The quoted language is patterned upon CALJIC No. 1.00, and is routinely given in noncapital cases and at the guilt phase of capital trials. (*People* v. *Easley* (1983) 34 Cal.3d 858, 875 [196 Cal.Rptr. 309, 671 P.2d 813].) It is intended to direct jurors to reach a verdict based solely on the "evidence" and without regard to such irrelevant and speculative "consequences" as public opinion (see *People* v. *Keenan, supra,* 46 Cal.3d 478, 518), or the punishment the defendant might receive (*People* v. *Brown* (1985) 40 Cal.3d 512, 537, fn. 7 [220 Cal.Rptr. 637, 709 P.2d 440]).

■ We have repeatedly held, however, that language instructing the jury to disregard the consequences of its verdict is inappropriate and should not be given at the *penalty* phase of a capital trial. (*People* v. *Mayfield, supra,* 5 Cal.4th 142, 183; *People* v. *Jennings* (1988) 46 Cal.3d 963, 991 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Keenan, supra,* 46 Cal.3d 478, 517; *People* v. *Wade* (1988) 44 Cal.3d 975, 998 [244 Cal.Rptr. 905, 750 P.2d 794]; *People* v. *Brown, supra,* 40 Cal.3d 512, 537, fn. 7.) "Our disapproval of the instruction lay in its potential to diminish the jury's sense of responsibility for the penalty decision . . . since the precise issue before the jury—whether the penalty shall be death or life imprisonment without possibility of parole—is the 'consequence' of the verdict." (*People* v. *Jennings, supra,* 46 Cal.3d 963, 991.)

Nevertheless, when the instructions given in this case are viewed as a whole, it is not reasonably likely that the jury was misled as to the nature and gravity of its sentencing responsibility. The trial court gave, among other things, CALJIC No. 8.88, which directs the sentencer to consider and "weigh" the various factors in aggravation and mitigation and to select the "appropriate" penalty under the totality of the circumstances. (See *People* v. *Brown, supra,* 40 Cal.3d 512, 538-545 & fn. 19.) Another standard penalty instruction, CALJIC No. 8.85, directed the jury to consider any circumstance extenuating the gravity of the crime and "any sympathetic or other aspect of the defendant's character or record" proffered by the defense as a basis for a sentence less than death. (See *People* v. *Easley, supra,* 34 Cal.3d 858, 877-878 & fn. 10 [construing section 190.3, factor (k)].)

In addition, the trial court granted defendant's request for certain special instructions highlighting the breadth of mitigating factors deemed relevant to the penalty decision,[20] including repeated references to sympathy,

---

[20]The trial court gave special defense instruction No. 10 as follows: "A mitigating circumstance does not constitute a justification or excuse for the offenses in question. A mitigating circumstance is a fact about the offenses or about the defendant, which in fairness, sympathy, compassion or mercy, may be considered in extenuating or reducing the degree of

compassion, and mercy.[21] Another special defense instruction prohibited consideration of such irrelevant matters as "deterrence" and "monetary cost."[22] Against this backdrop, the jury almost certainly understood that it was entitled to disregard only those "consequences" not constitutionally relevant to its sentencing decision, and that it bore the ultimate responsibility for choosing between death and life imprisonment without parole based on the particular circumstances of the case. We therefore reject defendant's claim that he was prejudiced by the giving of an ignore-the-consequences instruction at the penalty phase.

### 2. *Absence of Mitigation.*

█ Defendant contends the trial court erred in failing to instruct sua sponte that the jury could impose a sentence of life imprisonment without parole even if it found no circumstances in mitigation. (See *People* v. *Duncan, supra,* 53 Cal.3d 955, 979 ["The jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death."].) Defendant insists that the lack of such an instruction violated his right to due process and to a reliable penalty determination under the federal Constitution, and denied him equal protection of the law under the federal and state Constitutions. We reject the claim.

As *People* v. *Duncan, supra,* 53 Cal.3d at pages 978-979, and other cases make clear, the standard instructions given in this case adequately guide selection of the appropriate punishment, including the jury's discretion to reject a death sentence under the circumstances highlighted by defendant. Specifically, CALJIC No. 8.88 informed jurors that in order "[t]o return a judgment of death, each of you must be persuaded that the aggravating [evidence is] so substantial in comparison with the mitigating circumstances

---

moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense."

[21]The trial court gave special defense instruction No. 15 as follows: "An appeal to the sympathy or passions of a jury is inappropriate at the guilt phase of a trial. However, at the penalty phase, you may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment. [¶] You are not to be governed by conjecture, prejudice, public opinion, or public feeling. [¶] You may decide that a sentence of life without possibility of parole is appropriate for the defendant based upon the sympathy, pity, compassion and mercy you felt as a result of the evidence adduced during the penalty phase."

[22]The trial court gave special defense instruction No. 17 as follows: "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence, you may not consider for any reason whatsoever the deterrent or non-deterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a prisoner for life without the possibility of parole."

that it warrants death instead of life without parole." By stating that death *can* be imposed in only one circumstance—where aggravation substantially outweighs mitigation—the instruction clearly implies that a sentence less than death *may* be imposed in all other circumstances. "No reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673]; accord, *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1192 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

We conclude here, as before, that an instruction explicitly authorizing a sentence of life imprisonment in the absence of mitigating evidence was not required or necessary. The trial court therefore did not err in failing to give such an instruction.

E. *Constitutionality of the 1978 Death Penalty Law*

Defendant argues that the statutory scheme under which he was sentenced to death violates the federal and state Constitutions in numerous respects. Some of these claims are raised in summary fashion. All lack merit under decisions of the United States Supreme Court and this court.

1. *Death Eligibility.*

Defendant contends that the statutory scheme is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because the special circumstances which determine death eligibility are so numerous and broad that they fail to "genuinely narrow" the class of persons eligible for the death penalty (*Zant* v. *Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 249, 103 S.Ct. 2733]), or provide a " ' "meaningful basis" ' " for distinguishing the few murder cases in which death is imposed from the many in which it is not (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759]).

Similar claims have previously been rejected with respect to the death penalty scheme applicable in this case and to its closely related predecessor, the 1977 law. We decline to revisit the issue here. Thus, the special circumstances set forth in the statute are not overinclusive by their number or terms (*People* v. *Stanley*, *supra*, 10 Cal.4th 764, 842-843; *People* v. *Crittenden*, *supra*, 9 Cal.4th 83, 154-155; *People* v. *Wader*, *supra*, 5 Cal.4th 610, 669), nor have such categories been construed in an unduly expansive manner (*People* v. *Crittenden*, *supra*, at p. 155). Having been twice previously convicted of murder and found guilty of committing a third murder

during an attempted robbery in the present case, defendant falls within the "subclass" of convicted murderers upon whom capital punishment is properly imposed. (*Tuilaepa* v. *California* (1994) 512 U.S. 967, __ [129 L.Ed.2d 750, 759, 114 S.Ct. 2630]; see also *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871] [1977 law]; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467-468 [24 Cal.Rptr.2d 808, 862 P.2d 808] [1978 law].)

### 2. *Unitary Jury.*

■ Defendant argues that the statutory scheme is inherently flawed under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution insofar as it does not require separate juries at the guilt and penalty phases where prior murder convictions are used as special circumstances and as aggravating factors at sentencing. (See § 190.4, subd. (c) ["same jury" shall decide guilt, special circumstances, and penalty absent showing of "good cause"].) Defendant suggests that even where, as here, evidence of a defendant's prior murders is not introduced at the guilt phase, a separate penalty jury is necessary to (1) permit full voir dire concerning the potential impact of prior murders on jurors who sit at the penalty phase, and (2) ensure that jurors who determine guilt are not exposed to the prior murders during voir dire. Defendant claims that because the single-jury procedure requires the defense to choose between these alternatives, it violates constitutional guarantees to a fair trial, impartial jury, and reliable death judgment.

The claim fails for reasons we have previously explained. "In almost every capital trial, regardless of the special circumstances alleged, there will be evidence introduced [in aggravation] at the penalty phase . . . which would otherwise be irrelevant or inadmissible in the determination of guilt. Defense counsel are routinely faced with difficult tactical decisions in having to fashion voir dire inquiries that probe for possible penalty phase biases regarding such evidence, while stopping short of revealing information otherwise prejudicial and excludable in the guilt phase. Certainly such will almost always be the case where the special circumstance alleged is a prior murder or murders." (*People* v. *Nicolaus*, *supra*, 54 Cal.3d 551, 573.) Defendant cites no authority for the proposition that a death penalty scheme is constitutionally invalid unless it presents the defense with no difficult tactical choices in conducting voir dire or persuading jurors to reject a death sentence. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 252 [10 Cal.Rptr.2d 636, 833 P.2d 643] [separate juries not required to prevent penalty jury from "blam[ing] the defense for withholding" evidence of prior convictions and other violent crimes at guilt phase]; *People* v. *Taylor*, *supra*, 52 Cal.3d 719, 737-738 [separate juries not required to prevent penalty jury from questioning "credibility" of mental defense where defendant presented no evidence at

guilt phase].) As before, we decline to invalidate the scheme simply because it establishes a single-jury procedure that was followed here.

### 3. *Multiple Use of Facts.*

Defendant contends that the sentencing scheme violates the Eighth Amendment of the United States Constitution insofar as it directs that any special circumstance found true at the guilt phase be considered in aggravation at the penalty phase. (See § 190.3, factor (a).) Defendant suggests that such "dual use" of the same facts violates guarantees against multiple punishment, and precludes any meaningful distinction between murderers who are eligible for a death sentence and those who ultimately receive it. Similar claims have been rejected before. (E.g., *People* v. *Stanley, supra,* 10 Cal.4th 764, 820-821 [approving use of prior murder conviction as special circumstance and aggravating factor]; *People* v. *Gates, supra,* 43 Cal.3d 1168, 1188-1190 [approving use of felony murder as basis of first degree murder conviction, special circumstance, and aggravating circumstance].) Such cases reason, among other things, that the facts underlying a special circumstance finding serve distinct purposes at different phases of trial, and that the sentencer weighs the various factors in aggravation and mitigation in determining the appropriate penalty in a particular case. We see no basis for a contrary conclusion here. (Accord, *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 241-246 [98 L.Ed.2d 568, 579-583, 108 S.Ct. 546]; *People* v. *Wader, supra,* 5 Cal.4th 610, 669; *People* v. *Webster* (1991) 54 Cal.3d 411, 456 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 945-946 [269 Cal.Rptr. 269, 790 P.2d 676].)

### 4. *Sentencing Factors.*

Defendant argues that three sentencing factors set forth in section 190.3 are impermissibly vague under the Eighth Amendment of the United States Constitution: factor (a) (circumstances of the capital crime), factor (b) (other criminal activity involving force or violence), and factor (i) (age at the time of the capital crime). Defendant contends that insofar as the standard instructions reflect the statutory language, they do not adequately define these factors or guide the jury's sentencing discretion. However, the United States Supreme Court has upheld the statute against the identical claim and determined that each factor conveys the requisite " 'common-sense core of meaning . . . that criminal juries should be capable of understanding.' " (*Tuilaepa* v. *California, supra,* 512 U.S. 967, __ [129 L.Ed.2d 750, 761]; accord, *People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 478; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Proctor* (1992) 4 Cal.4th 499, 550-551 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

■ Defendant also argues that section 190.3 is unconstitutionally vague because it does not expressly identify which factors are aggravating and which are mitigating. Absent such labels, instructions conforming to the language of the statute purportedly give the jury "no guidance" in weighing the relevant factors and in determining the appropriate penalty. This argument has been rejected before for reasons that apply equally here. "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." (*Tuilaepa* v. *California, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 764]; accord, *People* v. *Hawkins* (1995) 10 Cal.4th 920, 964 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People* v. *Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1196 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) In any event, no reasonable juror could be misled by the language of section 190.3 concerning the relative aggravating or mitigating nature of the various factors. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 944-945 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

Defendant further complains that section 190.3, factor (d), and the corresponding jury instructions given here, are invalid under the Eighth Amendment of the United States Constitution: because they suggest that "mental or emotional disturbance" is mitigating only if it is "extreme." This claim has been repeatedly rejected in light of the statute as a whole. Specifically, the catch-all language of section 190.3, factor (k) draws the sentencer's attention to " '[a]ny other circumstance which extenuates the gravity of the crime,' " and therefore allows consideration of any mental or emotional condition, even if it is not "extreme." (*People* v. *Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1226-1227 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Morales* (1989) 48 Cal.3d 527, 567-568 [257 Cal.Rptr. 64, 770 P.2d 244].)

### 5. *Prosecutorial Discretion.*

Defendant argues that the 1978 law is inherently infirm because prosecutors have "unbridled" discretion to decide when to seek the death penalty. He is mistaken. ■ "[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." (*People* v. *Keenan, supra,* 46 Cal.3d 478, 505; accord, *People* v. *Stanley, supra,* 10 Cal.4th 764, 843; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 78 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

### 6. *Proportionality Review and Other "Safeguards."*

Defendant argues that the death penalty scheme violates the Eighth Amendment of the United States Constitution and the equal protection

clauses of both the federal and state Constitutions because it contains no "intercase" proportionality requirement. For reasons stated many times before, we reject the claim. (*Pulley* v. *Harris, supra,* 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41]; *People* v. *Webb, supra,* 6 Cal.4th 494, 536; *People* v. *Marshall, supra,* 50 Cal.3d 907, 945-947; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1285-1288 [232 Cal.Rptr. 849, 729 P.2d 115].) It is also settled that the 1978 law provides adequate safeguards against arbitrary and unreliable death judgments even though it does not require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof as to the existence of all such aggravating factors beyond a reasonable doubt, (3) a finding that aggravation outweighs mitigation beyond a reasonable doubt, and (4) a finding that death is the appropriate penalty beyond a reasonable doubt. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

### F. *Automatic Motion to Modify the Verdict*

 Defendant insists the trial court considered "highly damaging" evidence never presented to the jury in ruling on the automatic motion to modify the death verdict. (§ 190.4, subd. (e).)[23] The court purportedly exceeded its statutory authority and violated defendant's right to due process under the federal Constitution. We disagree.

At the start of the hearing, the court described its duty to "review the evidence," to consider and be guided by the aggravating and mitigating factors, and to make an "independent determination" whether the jury's finding that aggravation outweighed mitigation was contrary to law or the evidence presented. The court indicated that it had "examined and carefully reviewed" the evidence introduced at all four phases of trial, and that it had compared "its own notes" with the official transcript of the proceedings.

As a result, the court found proof beyond a reasonable doubt to support the jury's verdict of guilt as to all counts, including the intentional murder of Kathy Hyde during the commission or attempted commission of a robbery and the existence of the two prior-murder-conviction special circumstances. The murder and special circumstances were identified as aggravating factors on the issue of penalty. (§ 190.3, factor (a).) In particular, the court noted

---

[23]Section 190.4, subdivision (e) (section 190.4(e)) states in pertinent part: "In ruling on the [automatic motion to modify the death verdict], the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

that defendant had assumed a leadership role in attempting to rob the Barrel House, that Hyde was fleeing the scene and posed no immediate threat at the time she was mortally wounded, and that defendant shot both victims in a calculated attempt to avoid "possible identification." Four other crimes involving the use or threat of violence were considered in aggravation under section 190.3, factor (b)—the 1974 and 1984 Michigan murders, the 1984 Michigan armed robbery, and defendant's possession of a weapon while incarcerated for the most recent Michigan murder. Because most of these other crimes resulted in felony convictions obtained after, rather than before, commission of the capital crimes, the court found that section 190.3, factor (c) was nonaggravating and neutral.

Finally, the court determined that no mitigating factors were present other than section 190.3, factor (k), which permits consideration of any "extenuating" circumstance relating to the capital offense or offender. However, the court concluded that any sympathetic inferences that could be drawn from evidence of defendant's troubled childhood, mental defects, and religious conversion were far "outweighed" by the calculated nature of the capital crimes and by his extensive criminal history.

Defendant now observes that in considering the circumstances of the capital crimes under section 190.3, factor (a), the court referred to the fact that the 1984 Michigan murder occurred only a "couple of months" after defendant had finished serving his sentence for the 1974 murder conviction, and that defendant and Schultz promptly fled to Bakersfield and committed the capital crimes "believing that the [Michigan] police may be looking for" them. Defendant insists the jury was never apprised either of his fugitive status at the time of the capital crimes or of the proximity of his release from prison to the two 1984 murders. According to defendant, such information was contained only in portions of his confessions that were never admitted into evidence at trial.

No error occurred. Based on its remarks both at the start of the hearing and immediately before the challenged statements, the trial court clearly understood its duty to consider only those materials that had been presented to the jury in ruling on the section 190.4(e) motion. Indeed, the court recalled that both edited and unedited versions of each confession had been prepared during trial, that only the edited versions had been admitted into evidence, and that the court had reviewed the audiotapes and transcripts relating solely to the edited confessions in preparing for the section 190.4(e) hearing. The court made clear that it had not reviewed "the entire taped confessions," and that it had considered "only the portions that were submitted to the jury."

Second, the facts cited by the trial court and disputed on appeal are readily inferable from evidence presented to the jury, including defendant's confessions, testimony by Investigator Leffel at the guilt and enhancement phases, and evidence of defendant's Michigan convictions introduced at the enhancement and special circumstance phases. Viewed as a whole, this evidence revealed the following chain of events: defendant was convicted of second degree murder in 1974, was imprisoned in Marquette for about 10 years, and was released sometime before Bryant was murdered in Michigan on April 1, 1984. Defendant and Schultz arrived in Bakersfield by bus a short time after the murder (i.e., the "beginning of April" according to defendant), and committed the instant robbery murder on April 17. Defendant acknowledged during the second confession that he and Schultz returned to Detroit by bus on April 22 and were arrested by the FBI for the Michigan murder within a "couple of hours" of their arrival. In summarizing his 1984 crime spree in the second confession, defendant said he was "more dangerous in them three months" than at any other time in his life.

Distilled, the foregoing evidence indicated that defendant had been out of prison no more than "three months" at the time the capital crimes occurred in Bakersfield, and that Bryant was murdered in Michigan two and one-half weeks before the capital crimes. The court could thus reasonably draw the first inference challenged on appeal—that defendant committed the 1984 Michigan murder approximately two months after he was released from prison. Moreover, the fact that defendant and Schultz traveled to Bakersfield immediately after the 1984 Michigan murder and were arrested immediately upon their return strongly suggests that they originally left Michigan in order to avoid capture. Hence, the trial court could reasonably infer that the capital crimes were committed in California during a time in which defendant believed Michigan authorities were "looking for him." As a result, the court did not err in its recitation of the circumstances of the capital crimes during the section 190.4(e) hearing. We therefore reject defendant's claim that the automatic motion to modify the death verdict was improperly denied.

## G. *Cumulative Effect of Trial Court Rulings*

Defendant contends that the trial court committed numerous errors that resulted in cumulative prejudice requiring reversal of the death judgment. However, with one minor exception, we have rejected each claim of evidentiary and instructional error at the penalty phase. The court also did not err in permitting prosecutorial argument on defendant's future dangerousness and in denying the automatic motion to modify the verdict. We therefore cannot conclude that affirmance of the death judgment results in a miscarriage of justice under the state Constitution, or violates defendant's rights to due process and a reliable penalty determination under the federal Constitution.

## IV. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Lucas, J.,* and Arabian, J.,† concurred.

**GEORGE, C. J.—** ▮▮▮ I concur in the majority's affirmance of the guilt and penalty judgments. I write separately because I believe that, for the guidance of trial courts and counsel in pending capital cases, it is appropriate to address directly on the merits defendant's novel claim that, at the penalty phase of a capital case, the prosecution is precluded from proving "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," for purposes of Penal Code section 190.3, factor (b),[1] through the introduction of evidence that the defendant has been *convicted* of a crime involving force or violence or the threat of force or violence, and that the prosecution instead is *required*, even when a defendant has suffered such a conviction, to call the witnesses who testified at the earlier trial and in essence to retry the earlier case. (See maj. opn., *ante*, at pp. 348-350.) As I shall explain, I believe that defendant's contention clearly lacks merit and that it is advisable at this point to put to rest any possible doubts regarding this question.

I

As originally enacted in 1872, section 190 provided for the imposition of capital punishment as the penalty for first degree murder. Two years later, in 1874, section 190 was amended to provide an alternative penalty of life imprisonment "at the discretion of the jury." For decades thereafter, this discretion was not subject to any statutory limitations or guidance.

In *People* v. *Friend* (1957) 47 Cal.2d 749 [306 P.2d 463], we commented upon the lack of guidance or information afforded the jury in choosing the appropriate sentence in a capital case: "The character and scope of evidence pertinent to punishment which should be received in a case wherein the jury is required to fix the penalty, is a subject which could well receive legislative attention. This state has long since accepted the view (as recognized and implemented by the indeterminate sentence laws and other acts) that, generally speaking, punishment should be fitted to the perpetrator of the crime,

---

*Retired Chief Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

not merely the crime. In tailoring punishment for most offenders the controlling agency has the benefit of a complete study of the person. In the whole life story the particular crime is an incident, a controlling one for the time being, probably, but only one of many which the board considers in reaching its ultimate conclusion. It seems, therefore, incongruous that in a case of first degree murder the jury conceivably may be given the responsibility of selecting life imprisonment or death as punishment, but in making that determination may be denied the full measure of enlightenment which for less drastic punishments is available to the administrative board. It appears that in this respect the law, when and if so applied, continues the outmoded view that punishment must inexorably fit the crime, not the offender." (*Id.* at p. 763, fn. 7.)

Our observations in *Friend* led to the enactment that same year (1957) of former section 190.1, providing for separate trials of the guilt and penalty issues in a capital proceeding. (See 3 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Punishment for Crimes, § 1592, pp. 1898-1899.) As enacted in 1957, former section 190.1 provided that "[e]vidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's *background and history*, and of any facts in aggravation or mitigation of the penalty." (Stats. 1957, ch. 1968, § 2, pp. 3509-3510, italics added.) Shortly after its enactment, we held that this statute "embodie[d] the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed." (*People* v. *Jones* (1959) 52 Cal.2d 636, 647 [343 P.2d 577].)

From the outset of the adoption of bifurcated capital proceedings in California, it has been consistently recognized that, at the penalty phase, the prosecution may introduce evidence of a defendant's prior convictions to bring before the sentencing jury the facts concerning the defendant's past conduct. (See, e.g., *People* v. *Pike* (1962) 58 Cal.2d 70, 94, fn. 14 [22 Cal.Rptr. 664, 372 P.2d 656] ["The evidence of the prior conviction, of course, was admissible on the penalty phase."]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 100 [10 Cal.Rptr. 167, 358 P.2d 295, 82 A.L.R.2d 1086].) Indeed, insofar as this court's decisions disclose, the admissibility of a defendant's prior convictions for this purpose at the penalty phase of a death penalty proceeding never was questioned; the only issues that arose in this regard concerned the extent to which the prosecution could go *beyond* evidence of prior convictions, either to present additional evidence in instances in which there had been a conviction (see, e.g., *People* v. *Purvis* (1959) 52 Cal.2d 871, 880-882 [346 P.2d 22]), or to introduce evidence of prior criminal conduct of which the defendant had not been convicted (see,

e.g., *People* v. *Mathis* (1965) 63 Cal.2d 416, 427 [46 Cal.Rptr. 785, 406 P.2d 65]).

Thus, for example, in concluding in *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], that the prosecution at the penalty phase could not introduce evidence showing simply that in the past an information had been filed charging the defendant with a criminal offense, the court explained: "Although an information is more probative of guilt than arrest because it proceeds one step further in the criminal process, *in neither situation has a jury found beyond reasonable doubt that the defendant has committed the alleged offense. Short of this safeguard* the use of incidents in the preliminary stages of the criminal process as evidence to prove that a defendant has committed an alleged criminal act becomes too prejudicial when weighed against its probative value." (*Id.* at p. 149, italics added.) This reasoning makes it clear, of course, that the court in *Terry* took for granted that the record of *a prior conviction*, which signified that a jury *had* found beyond a reasonable doubt that the defendant had committed the alleged offense, *was* sufficiently reliable to establish the defendant's conduct for purposes of the penalty phase.

Justice Mosk's dissenting opinion in *People* v. *McClellan* (1969) 71 Cal.2d 793, 812 [80 Cal.Rptr. 31, 457 P.2d 871] makes this point even more explicitly. In *McClellan*, Justice Mosk dissented from the majority's conclusion that when the prosecution, at the penalty phase, introduces evidence that the defendant engaged in prior crimes of which he had not been convicted, the jury must be instructed that it should not consider the prior crimes unless it finds that the crimes have been proven beyond a reasonable doubt. In the course of his dissent, Justice Mosk observed: "For efficient trial procedure, trial courts and counsel are entitled to know how prior crimes are to be established at the penalty trial; the majority offer little assistance. *Certainly a certified record of conviction will suffice.* But what of proof by, for example, eyewitness testimony [citation] or confession following independent proof of the corpus delicti [citation] or testimony by an accomplice, as in this case? It is clear that the *Terry* opinion . . . did not purport to exclude all evidence of prior crimes except formal convictions . . . ." (71 Cal.2d at p. 818 (dis. opn. of Mosk, J.).)

Thus, a review of this court's decisions establishes beyond question that, under the initial legislation establishing California's bifurcated capital proceedings, the prosecution, at the penalty phase of a death penalty trial, could rely upon evidence of prior convictions to establish that the defendant had engaged in prior criminal activity. (See generally, Comment, *The California Penalty Trial* (1964) 52 Cal.L.Rev. 386, 394-398.)

## II

In 1972, this court concluded that the then existing California death penalty statute was unconstitutional. (See *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]; see also *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) In 1976, the United States Supreme Court handed down a group of decisions that provided guidance as to the requirements of a constitutionally permissible death penalty statute (see *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]), and, shortly thereafter, this court, relying upon these recently decided United States Supreme Court decisions, concluded that the initial successor to the death penalty statute that had been invalidated in *Anderson* also was unconstitutional. (See *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101].)

The following year, the Legislature reinstated the death penalty in California through the enactment of the 1977 death penalty law. (Stats. 1977, ch. 316, §§ 1-26, pp. 1255-1266.) Among other features, the 1977 death penalty law set forth (in section 190.3) a list of factors that the jury (or the judge, if a jury is waived) is to consider at the penalty phase in choosing between the alternative sentences of death or life without possibility of parole. As enacted in 1977, section 190.3 included factor (b)—"[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence"—but did not include any other factor (such as the current factor (c), subsequently added in 1978) that specifically referred to criminal "convictions" sustained by the defendant.

The language and legislative history of section 190.3 as adopted in 1977 make it clear that, in enacting section 190.3, factor (b), the Legislature intended to authorize the prosecution to introduce *not only* evidence of a defendant's *conviction* of a crime involving the use or threat of force or violence, but *also* evidence that the defendant had engaged in such criminal activity without having been convicted of a crime (provided the defendant had not been prosecuted and acquitted of the crime). (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 69-72 [222 Cal.Rptr. 127, 711 P.2d 423] (lead opn. by Reynoso, J.) [reviewing the legislative history of section 190.3's reference to "criminal activity," as enacted in 1977].)

In this regard, the first three paragraphs of the 1977 version of section 190.3—which preceded the listing of the specified aggravating and mitigating factors and concerned the evidence that could be presented at the penalty

phase—are particularly instructive. Those paragraphs provided in relevant part: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence, including, but not limited to . . . the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the expressed or implied threat to use force or violence, and the defendant's character, background, [and] history . . . . [¶] However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence. *As used in this section, criminal activity does not require a conviction.* [¶] However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and was acquitted. The restriction on the use of this evidence is intended to apply only to proceedings conducted pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in other proceedings." (Stats. 1977, ch. 316, § 11, pp. 1258-1259, italics added.)

By providing in section 190.3 that "[a]s used in this section, criminal activity does not *require* a conviction" (italics added), the Legislature made it clear that the prosecution could present evidence of criminal activity by the defendant involving the use or threat of force or violence even if that activity had not resulted in a conviction. At the same time, the Legislature implicitly confirmed that when the defendant *had* been convicted of a crime involving the use or threat of force or violence, the prosecution, *of course*, could rely upon that conviction to establish "the presence . . . of criminal activity" for purposes of section 190.3, factor (b). Particularly when this language of the 1977 version of section 190.3 is considered in light of the consistent practice under the prior death penalty law, I believe it would be absurd to interpret the 1977 statute as *precluding* the prosecution from relying upon a prior conviction of a crime involving the use or threat of force or violence to prove the presence of other violent criminal activity within the meaning of section 190.3, factor (b), and instead as *requiring* the prosecution *to try anew* every prior violent crime offered in aggravation under factor (b), even when the defendant already had been convicted of the crime.

Such an interpretation would fly in the face of past practice and would be quite impractical, compelling the prosecution to relitigate fully—through the testimony of victims and witnesses and the presentation of physical and documentary evidence—each violent crime of which the defendant already had been convicted, and, at the same time, prohibiting the prosecution from bringing to the jury's attention at the penalty phase other violent criminal

activity of the defendant *that had resulted in a conviction,* whenever the physical evidence or witnesses presented in the earlier proceedings no longer were available. (As noted, section 190.3, as it read in 1977, contained no separate factor referring explicitly to the defendant's prior "convictions.") Nothing in the language or history of the 1977 legislation supports the claim that the Legislature intended to impose such limitations with regard to the proof of prior criminal activity of which the defendant had been convicted.

In 1978, section 190.3 was amended to expand the list of aggravating and mitigating factors, adding the present factor (c), which permits the sentencer to consider "the presence or absence of any prior felony conviction." Unlike factor (b), factor (c) is limited to crimes of which the defendant has been convicted (indeed, to *felony* convictions sustained by the defendant prior to the commission of the capital homicide (see *People* v. *Balderas* (1985) 41 Cal.3d 144, 201-203 [222 Cal.Rptr. 184, 711 P.2d 480])), but the provision at the same time encompasses *all* felony convictions, whether or not they involve the use or threat of force or violence. Significantly, nothing in the enactment of factor (c) in 1978 indicates any intent to modify the meaning or application of section 190.3, factor (b).

Accordingly, I believe it is clear both from the language and history of section 190.3, factor (b), as well as the decisional law that preceded its enactment, that the prosecution may establish the presence of "criminal activity" within the meaning of that provision by the introduction of the record of a conviction that involves the use or threat of force or violence. Although the statute does not *limit* the prosecution to the introduction of a record of conviction when the defendant has been convicted of a crime involving the use or threat of force or violence, it *permits* the prosecution to introduce such a conviction to establish the presence of other violent criminal activity committed by the defendant under section 190.3, factor (b).

### III

The conclusion set forth above is consistent with a host of this court's prior decisions interpreting and applying the current death penalty law. (See, e.g., *People* v. *Webster* (1991) 54 Cal.3d 411, 454 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Frierson* (1991) 53 Cal.3d 730, 747 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 880-881 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Hayes* (1990) 52 Cal.3d 577, 632-633 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 653-654, fn. 26 [274 Cal.Rptr. 252, 798 P.2d 849]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 280 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v.

*Melton* (1988) 44 Cal.3d 713, 754-757 & fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1201-1202 [240 Cal.Rptr. 666, 743 P.2d 301] [failure to give reasonable doubt instruction harmless where defendant had been convicted of other crimes].)[2]

## IV

Contrary to defendant's contention, this court's recent decision in *People* v. *Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] provides no basis for questioning the above authority. Although *Wheeler* observed that, as a general matter, a record of conviction is "hearsay" when offered as evidence to prove that the underlying criminal conduct was committed (*id.* at p. 298), and our decision applied that general legal principle in resolving the question whether a *misdemeanor* conviction is admissible for *impeachment* purposes (*id.* at pp. 299-300), *Wheeler* did not consider the permissible use of evidence of a prior conviction in a sentencing context, and did not examine the history of the use of prior convictions in California penalty phase proceedings or the language or legislative intent of section 190.3. Whatever may be true with regard to the limitations on the use of prior convictions in other contexts, I believe it is clear that, under the provisions of the governing death penalty statute, the prosecution may rely upon a prior *conviction* of a crime involving the use or threat of force or violence to establish the presence of criminal activity involving the use or threat of force or violence for purposes of section 190.3, factor (b).

Baxter, J., Werdegar, J., Lucas, J.,* and Arabian, J.,† concurred.

**MOSK, J.**—I concur in the opinion prepared for the court by Justice Baxter, being persuaded of the soundness of its reasoning and the correctness of its result.

---

[2]There is language in one isolated decision that appears to be inconsistent with this conclusion. The opinion in *People* v. *Champion* (1995) 9 Cal.4th 879, 937 [39 Cal.Rptr.2d 547, 891 P.2d 93] indicates that although evidence of a defendant's violent criminal activity underlying a juvenile adjudication of a violent crime is admissible to establish "criminal activity" under section 190.3, factor (b), the fact of the adjudication itself is inadmissible. In reaching this conclusion in *Champion,* however, the court did not consider the extensive background and legislative history of section 190.3, factor (b), reviewed above, and did not take into account the numerous decisions, cited in the text, in which our court has held that when a defendant has been convicted of a violent crime, both the conviction and the facts underlying the conviction are admissible to establish the presence of violent criminal activity for purposes of factor (b). Thus, to the extent the discussion in *Champion* is inconsistent with the above conclusion, I believe it is incorrect and should not be followed.

*Retired Chief Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

I write separately to address the question that the Chief Justice raises in his concurring opinion, viz., whether evidence of a prior conviction suffered by a defendant for a felony involving force or violence is inadmissible hearsay when offered at the penalty phase of a bifurcated capital trial to prove that he actually engaged in conduct involving force or violence.

## I

Before we consider the question with which we are here concerned, we must set out at some length the history of the death penalty law and also its outline.

Under the Penal Code as enacted in 1872, the death penalty law was simple. Section 190 of the code under that law provided that "[e]very person guilty of murder in the first degree shall suffer death . . . ." (1872 Pen. Code, § 190.)

In 1874, the 1872 death penalty law was changed. Section 190 of the Penal Code was amended to provide that "[e]very person guilty of murder in the first degree shall suffer death, or confinement in the State Prison for life, at the discretion of" the trier of fact. (Code Amends. 1873-1874 (Pen. Code) ch. 508, § 1, p. 457.)

So stood the 1874 death penalty law in pertinent part until it was changed in 1957. (Stats. 1957, ch. 1968, §§ 1-2, pp. 3509-3510.) Section 190 of the Penal Code continued to provide that "[e]very person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of" the trier of fact. (Stats. 1957, ch. 1968, § 1, p. 3509.) Section 190.1 was added to state: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of [such] an offense . . . , there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty . . . shall be in the discretion of the [trier of fact] on the evidence presented . . . ." (Stats. 1957, ch. 1968, § 2, pp. 3509-3510.)

Thus, the 1957 death penalty law bifurcated the capital trial into guilt and penalty phases. It also defined the issues that were material at the penalty phase. It did not, however, adopt any rules of evidence peculiar thereto.

Rather, it simply allowed the generally applicable evidentiary rules to govern. In *People* v. *Jones* (1959) 52 Cal.2d 636 [343 P.2d 577] (hereafter sometimes *Jones*), we stated in dictum that "[i]t would appear that" section 190.1 of the Penal Code under the 1957 law "embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed." (*People* v. *Jones*, *supra*, 52 Cal.2d at p. 647.) This language barely survived the filing of the opinion. In *People* v. *Purvis* (1959) 52 Cal.2d 871 [346 P.2d 22] (hereafter sometimes *Purvis*), disapproved on another point by *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], we held, albeit without mention of *Jones*, that, if evidence is inadmissible at the guilt phase, it is also inadmissible at the penalty phase; and that section 190.1 did not render evidence that was inadmissible at the guilt phase admissible at the penalty phase, but merely "broaden[ed] the scope of relevant evidence admissible on the issue of penalty . . . ." (*People* v. *Purvis*, *supra*, 52 Cal.2d at p. 883.) Subsequently, in *People* v. *Hamilton* (1963) 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412] (hereafter sometimes *Hamilton*), disapproved on another point by *People* v. *Morse*, *supra*, 60 Cal.2d at pages 648-649, we held to the same effect in the very face of *Jones*: If evidence is inadmissible at the guilt phase, it is also inadmissible at the penalty phase (*People* v. *Hamilton*, *supra*, 60 Cal.2d at pp. 128-131); section 190.1 did not render evidence that was inadmissible at the guilt phase admissible at the penalty phase—it did not "relax[] the manner in which the relevant facts may be proved" (60 Cal.2d at p. 128, fn. 9)—but merely "broaden[ed] and enlarge[d] the permissible range of inquiry" (*ibid.*). Among the rules of evidence applicable at the penalty phase as well as at the guilt phase, as we expressly recognized in *Purvis*, is the one that declares that hearsay—an out-of-court statement offered to prove the truth of the matter stated—is generally inadmissible. (*People* v. *Purvis*, *supra*, 52 Cal.2d at p. 883.) Hence, our conclusion in *People* v. *Nye* (1969) 71 Cal.2d 356, 372 [78 Cal.Rptr. 467, 455 P.2d 395] (hereafter sometimes *Nye*), expressly based on our holding in *Hamilton*: "Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase."

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (hereafter *Anderson*), we declared the 1957 death penalty law to be invalid under the cruel or unusual punishment clause of former section 6, present section 17, of article I of the California Constitution. Later that year, in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] (hereafter *Furman*), the United States Supreme Court raised a question whether state death penalty laws then in operation were invalid under the cruel and unusual punishments clause of the Eighth Amendment to the

United States Constitution, as made applicable to the states through the due process clause of the Fourteenth Amendment, at least insofar as such laws provided for the discretionary imposition of capital punishment. Still later that year, our decision in *Anderson* was overruled by popular initiative (Prop. 17, approved by initiative, Gen. Elec. (Nov. 7, 1972)), which added section 27 to article I of the California Constitution, stating that the 1957 law was in "full force and effect" and did not authorize a punishment that was "cruel or unusual . . . within the meaning of" the state charter.

In 1973, in evident response to *Furman* and its questioning of the discretionary imposition of capital punishment, the 1957 death penalty law was replaced with one similar to that of 1872, which provided for the mandatory imposition of capital punishment without a penalty phase. (Stats. 1973, ch. 719, §§ 1-15, pp. 1297-1302.)

Under the 1973 death penalty law, a new section 190 was added to the Penal Code (Stats. 1973, ch. 719, § 2, p. 1297) in place of its contemporaneously repealed 1957 counterpart (Stats. 1973, ch. 719, § 1, p. 1297), stating that "[e]very person guilty of murder in the first degree shall suffer death if any one or more of" certain enumerated "special circumstances" were found true (Stats. 1973, ch. 719, § 2, p. 1297).

So too a new section 190.1 was added to the Penal Code under the 1973 death penalty law (Stats. 1973, ch. 719, § 4, p. 1298) in place of its contemporaneously repealed 1957 counterpart (Stats. 1973, ch. 719, § 3, p. 1298): the repealed provision had established the penalty phase and had defined the issues that were material thereat; the new one did not reestablish such a phase or redefine such issues.

In *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101] (hereafter sometimes *Rockwell*), we declared the 1973 death penalty law to be invalid under the Eighth Amendment to the United States Constitution, as construed in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909], *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960], *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950], *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978], and *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001], because it provided for the mandatory imposition of capital punishment without allowing the trier of fact to consider "evidence of mitigating circumstances as to the offense or in the personal characteristics of the defendant," and without affording it "specific detailed guidelines as to the relevance of such evidence in determining whether death is an appropriate punishment" (*Rockwell* v. *Superior Court, supra,* 18 Cal.3d at p. 445).

In 1977, in response to *Rockwell*, the 1973 death penalty law was replaced with one similar to that of 1957, which provided for the discretionary imposition of capital punishment after a penalty phase. (Stats. 1977, ch. 316, §§ 1-26, pp. 1255-1266.)

Under the 1977 death penalty law, a new section 190 was added to the Penal Code (Stats. 1977, ch. 316, § 5, p. 1256) in place of its contemporaneously repealed 1973 counterpart (Stats. 1977, ch. 316, § 4, p. 1256), stating that "[e]very person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life" (Stats. 1977, ch. 316, § 5, p. 1256).

So too, a new section 190.1 was added to the Penal Code under the 1977 death penalty law (Stats. 1977, ch. 316, § 7, p. 1257) in place of its contemporaneously repealed 1973 counterpart (Stats. 1977, ch. 316, § 6, p. 1257), again establishing a penalty phase.

Likewise, a new section 190.2 was added to the Penal Code under the 1977 death penalty law (Stats. 1977, ch. 316, § 9, p. 1257) in place of its contemporaneously repealed 1973 counterpart (Stats. 1977, ch. 316, § 8, p. 1257), stating that "[t]he penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which one or more of" certain enumerated "special circumstances" was found true (Stats. 1977, ch. 316, § 9, p. 1257).

Then, a new section 190.3 was added to the Penal Code under the 1977 death penalty law (Stats. 1977, ch. 316, § 11, pp. 1258-1260) in place of its contemporaneously repealed 1973 counterpart (Stats. 1977, ch. 316, § 10, p. 1258), again defining issues that were material at the penalty phase. It bears close scrutiny.

In its Penal Code section 190.3, evidently in response to *Rockwell*'s implicit requirement to allow the trier of fact to consider "evidence of mitigating circumstances as to the offense or in the personal characteristics of the defendant" (*Rockwell* v. *Superior Court, supra*, 18 Cal.3d at p. 445), the 1977 death penalty law defined the issues that were material at the penalty phase: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence, including, but not limited to, the nature and circumstances of the present offense, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the expressed or implied threat to

use force or violence, and the defendant's character, background, history, mental condition and physical condition. [¶] However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction. [¶] However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and was acquitted." (Stats. 1977, ch. 316, § 11, pp. 1258-1259.)

Also in its Penal Code section 190.3, evidently in response to *Rockwell*'s implicit requirement to afford the trier of fact "specific detailed guidelines as to the relevance of [the] evidence [in question] in determining whether death is an appropriate punishment" (*Rockwell* v. *Superior Court, supra*, 18 Cal.3d at p. 445), the 1977 death penalty law for the first time articulated the factors that were to inform the determination of penalty: "In determining the penalty the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence. [¶] (c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] (d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] (e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] (f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] (g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects [*sic*] of intoxication. [¶] (h) The age of the defendant at the time of the crime. [¶] (i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] (j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (Stats. 1977, ch. 316, § 11, pp. 1259-1260.)

Thus, like its predecessor in 1957, the 1977 death penalty law bifurcated the capital trial into guilt and penalty phases. Also like that of 1957, the 1977 law defined the issues that were material at the latter phase, although in addition it articulated the factors that were to inform the underlying determination. Finally, like that of 1957, the 1977 law did not adopt any rules of

evidence peculiar to the penalty phase. Rather, it simply allowed the generally applicable evidentiary rules to govern. As a result, we implicitly concluded in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], what we had explicitly concluded in *Nye*: "Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase." (*People* v. *Nye*, *supra*, 71 Cal.2d at p. 372; see *People* v. *Harris*, *supra*, 36 Cal.3d at pp. 68-71 (plur. opn. by Broussard, J.); *id.* at p. 75 (dis. opn. of Kaus, J.).)

Lastly, in 1978, the 1977 death penalty law was replaced, by popular initiative, with the present law, which continues to provide for the discretionary imposition of capital punishment after a penalty phase. (Prop. 7, approved by initiative, Gen. Elec. (Nov. 7, 1978), as amended.)

The 1978 death penalty law is substantially similar to the 1977 law. In its Penal Code section 190.2, however, it adds to and expands the enumerated special circumstances. In its Penal Code section 190.3, it includes in the list of issues that are material at the penalty phase "any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence." In the same provision, for purpose of conformity, it includes in the list of factors that are to inform the underlying determination "(c) The presence or absence of any prior felony conviction." The presence or absence of a prior felony conviction "reflects on the relative contributions of character and situation"—its presence "suggests that the capital offense is the product more of the defendant's basic character than of the accidents of his situation, whereas its absence suggests the opposite." (*People* v. *Gallego* (1990) 52 Cal.3d 115, 208-209, fn. 1 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.).) Its presence also "reveals that the defendant had been taught, through the application of formal sanction, that criminal conduct was unacceptable—but had failed or refused to learn his lesson." (*Id.* at p. 209, fn. 1 (conc. opn. of Mosk, J.).)

Thus, like its predecessor in 1977, the 1978 death penalty law bifurcates the capital trial into guilt and penalty phases. Also like that of 1977, the 1978 law defines the issues that are material at the penalty phase—including all felony convictions[1]—and articulates the factors that are to inform the underlying determination—including such convictions. Finally, like that of 1977, the 1978 law does not adopt any rules of evidence peculiar to the penalty phase. Rather, it simply allows the generally applicable evidentiary

---

[1]It is of course at least arguable that, in Penal Code section 190.3, the 1977 death penalty law *impliedly* included all prior felony convictions in its list of issues that were material at the penalty phase. Recall that the law provided that, "[i]n the proceedings on the question of penalty, evidence may be presented" generally "as to *any* matter relevant to aggravation, mitigation, and sentence . . . ." (Stats. 1977, ch. 316, § 11, pp. 1258-1259, italics added.) As explained in the text, a prior felony conviction is such a matter.

rules to govern. As a result, we explicitly concluded in *People* v. *Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436] (hereafter sometimes *Edwards*), what we had explicitly concluded in *Nye*: " 'Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase.' " (*People* v. *Edwards*, *supra*, 54 Cal.3d at p. 838, quoting *People* v. *Nye*, *supra*, 71 Cal.2d at p. 372.)

## II

Having set out the history and outline of the death penalty law at some length, we may now turn to the question whether a defendant's prior conviction of a felony involving force or violence is, indeed, inadmissible hearsay when offered at the penalty phase to prove that he actually engaged in conduct involving force or violence. The analysis is simple. Let us take the steps together.

First, the 1978 death penalty law, like each of its predecessors providing for a penalty phase, does not adopt any rules of evidence peculiar thereto, but simply allows the generally applicable evidentiary rules to govern.

Second, as we held in *Purvis* and *Hamilton*, if evidence is inadmissible at the guilt phase, it is also inadmissible at the penalty phase. (*People* v. *Purvis*, *supra*, 52 Cal.2d at p. 883; *People* v. *Hamilton*, *supra*, 60 Cal.2d at pp. 128-131.)

Third, hearsay is an out-of-court statement offered to prove the truth of the matter stated.

Fourth, at the penalty phase as well as at the guilt phase, hearsay is generally inadmissible. To quote *Edwards*, which in turn quotes *Nye*: " 'Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase.' " (*People* v. *Edwards*, *supra*, 54 Cal.3d at p. 838, quoting *People* v. *Nye*, *supra*, 71 Cal.2d at p. 372.)

Fifth, hearsay encompasses a prior felony conviction when offered to prove that the defendant actually engaged in the underlying conduct. Such a conviction is in substance a statement by a previous court that the defendant did in truth engage in the conduct in question. We so held in *People* v. *Wheeler* (1992) 4 Cal.4th 284, 297-298 [14 Cal.Rptr.2d 418, 841 P.2d 938] (hereafter sometimes *Wheeler*).

Sixth, hearsay encompasses a prior felony conviction involving force or violence when offered at the penalty phase to prove that the defendant actually engaged in conduct involving force or violence.

Seventh, a prior felony conviction is not *inadmissible* hearsay when offered to prove that the defendant actually engaged in the underlying conduct *if it comes within an exception for use in a civil action*. (Evid. Code, § 1300.) In *Wheeler*, we explained that, "despite its hearsay character, '[such a conviction] is peculiarly reliable.' The 'seriousness of the charge[]' . . . encourages its full litigation, and the reasonable doubt standard of conviction ensures 'that the question of guilt will be thoroughly considered.' " (*People v. Wheeler, supra*, 4 Cal.4th at p. 298.) Likewise, a prior felony conviction is not *inadmissible* hearsay when offered to prove that the defendant actually engaged in the underlying conduct *if it comes within an exception for use, apparently in any action, to attack his credibility as a witness*. (Evid. Code, § 788.) But unless it comes within at least one of these exceptions, a prior felony conviction is, indeed, inadmissible hearsay when offered to prove that the defendant actually engaged in the underlying conduct.

Therefore, to the question with which we are here concerned, the answer is yes. A defendant's prior conviction of a felony involving force or violence is, indeed, inadmissible hearsay when offered at the penalty phase to prove that he actually engaged in conduct involving force or violence. By its very terms, the civil action exception is inapplicable. So too the credibility exception.

### III

In what can only be called a novel discussion, the Chief Justice gives a negative answer to our question, saying that a defendant's prior conviction of a felony involving force or violence is not inadmissible hearsay when offered at the penalty phase to prove that he actually engaged in conduct involving force or violence. He errs thereby. Such is the lesson of the analysis presented above. In an effort to prevent the mischief that would otherwise be sure to follow, I shall attempt to expose the source and substance of his error.

As his foundation, the Chief Justice chooses the *Jones* dictum that "[i]t would appear that" section 190.1 of the Penal Code under the 1957 death penalty law "embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed." (*People v. Jones, supra*, 52 Cal.2d at p. 647.) He builds on sand. That is because, in *Purvis* and *Hamilton*, we effectively disapproved that language. In *Purvis* and *Hamilton*, we held: If evidence is inadmissible at the guilt phase, it is also inadmissible at the penalty phase; section 190.1 did not render evidence that was inadmissible at the guilt phase admissible at the

penalty phase, but merely, in *Purvis*'s words, "broaden[ed] the scope of relevant evidence admissible on the issue of penalty" (*People* v. *Purvis, supra*, 52 Cal.2d at p. 883) or, in *Hamilton*'s words, "broaden[ed] and enlarge[d] the permissible range of inquiry" (*People* v. *Hamilton, supra*, 60 Cal.2d at p. 128, fn. 9).

The Chief Justice asserts reason supports his position that prior felony convictions involving force or violence are excepted from the hearsay rule when offered at the penalty phase to prove force or violence. It does not. He seems to base his argument on the declaration in Penal Code section 190.3 that, for purposes of criminal activity involving force or violence, "criminal activity does not require a conviction." He draws the expected and reasonable inference that such criminal activity is admissible whether or not it resulted in a conviction. But he then purports to draw an inference of an altogether different sort, to the effect that the conviction itself is admissible. That is a non sequitur.

The Chief Justice then says that authority supports his position that prior felony convictions involving force or violence are excepted from the hearsay rule when offered at the penalty phase to prove force or violence. It does not. None of the cases on which he relies even considers the proposition whether such convictions are hearsay; at most, some merely assume that they are admissible. (See *People* v. *Webster* (1991) 54 Cal.3d 411 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Frierson* (1991) 53 Cal.3d 730 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Daniels* (1991) 52 Cal.3d 815 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Whitt* (1990) 51 Cal.3d 620 [274 Cal.Rptr. 252, 798 P.2d 849]; *People* v. *Lewis* (1990) 50 Cal.3d 262 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Lucky* (1988) 45 Cal.3d 259 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Gates* (1987) 43 Cal.3d 1168 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 38-84 [222 Cal.Rptr. 127, 711 P.2d 423] (plur. opn. by Reynoso, J.); *People* v. *McClellan* (1969) 71 Cal.2d 793, 812-819 [80 Cal.Rptr. 31, 457 P.2d 871] (conc. and dis. opn. of Mosk, J.); *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381]; *People* v. *Pike* (1962) 58 Cal.2d 70 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Robillard* (1960) 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], disapproved on another point, *People* v. *Morse, supra*, 60 Cal.2d at pp. 648-649.) " 'It is axiomatic,' of course, 'that cases are not authority for propositions not considered.' " (*People* v. *Jones* (1995) 11 Cal.4th 118, 123, fn. 2 [44 Cal.Rptr.2d 164, 899 P.2d 1358], quoting *People* v. *Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].) It may be natural to assume that a prior felony conviction is admissible.

(See, e.g., *People* v. *McClellan, supra,* 71 Cal.2d at p. 818 (conc. and dis.opn. of Mosk, J.).) As we explained in *Wheeler,* "despite its hearsay character, '[such a conviction] is peculiarly reliable.'" (*People* v. *Wheeler, supra,* 4 Cal.4th at p. 298.) The fact remains, however, that a conviction of this sort is indeed hearsay and, as such, generally inadmissible.

The Chief Justice finally marshals a parade of horribles: Unless prior felony convictions involving force or violence are excepted from the hearsay rule when offered at the penalty phase to prove force or violence, the People would be required to "retry" the prior felonies and may sometimes be unable to do so successfully.

One may doubt that the People would be *required* to "retry" prior felonies involving force or violence. Our experience teaches us that the record of conviction is often replete with evidence of force or violence that comes comfortably within established exceptions to the hearsay rule, such as admissions by the defendant himself (Evid. Code, § 1220) and former testimony by witnesses at the earlier proceedings (*id.,* § 1291). (See, e.g., *People* v. *Wharton* (1991) 53 Cal.3d 522, 589-590 [280 Cal.Rptr. 631, 809 P.2d 290] [former testimony]; *People* v. *Hayes, supra,* 52 Cal.3d at pp. 632-633 [admission].)

One may also doubt that the People would *complain* of any requirement to "retry" prior felonies involving force or violence. Our decisions demonstrate that they freely shoulder the burden, much to the chagrin of defendants, in order to display the bloody deeds themselves instead of relying on a bloodless piece of paper evidencing a conviction. (See, e.g., *People* v. *Fierro* (1991) 1 Cal.4th 173, 230-231 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Benson* (1990) 52 Cal.3d 754, 787-789 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Karis* (1988) 46 Cal.3d 612, 638-641 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Brown* (1988) 46 Cal.3d 432, 445 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People* v. *Melton, supra,* 44 Cal.3d at pp. 754-757; *People* v. *Gates, supra,* 43 Cal.3d at pp. 1201-1203.)

But one cannot doubt that, in some isolated case, the People might be unable to "retry" a prior felony successfully. That may be a fact, yet it is of no consequence. In *Edwards* we held that a defendant's right under the Eighth Amendment to the United States Constitution to present "all 'relevant mitigating evidence' . . ." does not "entitle[] him to present any evidence" of this sort "in any form he desires," including hearsay. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 837.) Out of simple fairness, we should hold that whatever right the People may have under any source of law to present all

aggravating evidence does not entitle them to present any evidence of this sort in any form they desire, including hearsay.

## IV

With all that said, because I am persuaded of the soundness of its reasoning and the correctness of its result, I concur in the opinion prepared for the court by Justice Baxter.

Appellant's petition for a rehearing was denied June 26, 1996.